Argued October 20, affirmed in part, reversed in part and
remanded for trial December 20, 1976, reconsideration denied
January 26, review denied March 29, 1977

## STATE OF OREGON, *Appellant,*
### *v.*
## DAVID ANDREW JONES, *Respondent.*
## (No. 76-1079, CA 6233)

557 P2d 264

*W. Michael Gillette,* Solicitor General, Salem, argued the cause for appellant. With him on the brief were Lee Johnson, Attorney General, and Janet A. Metcalf, Assistant Attorney General, Salem.

*Paul J. De Muniz,* Deputy Public Defender, Salem, argued the cause for respondent. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Before Schwab, Chief Judge, and Lee and Tanzer, Judges.

LEE, J.

**LEE, J.**

Defendant was indicted for rape in the first degree, ORS 163.375. The state appeals from a pretrial order suppressing defendant's statements, allegedly obtained in violation of his Miranda rights, and hearsay statements of the alleged victim.

On September 14, 1975, the alleged rape victim (a Ms. Anita Roberts, now deceased, hereinafter "Roberts") went to the Eugene police station to inquire about a place to stay. She was given a map containing directions to a Women's Center at 1941 University Street. While at the station she looked clean and her demeanor was relaxed. The clerk on duty testified that Roberts left the station "a little after" 3:30 a.m.

That same morning, Mr. Berg, the resident manager of the Rose Motel at 9695 Franklin Boulevard in Eugene, was awakened "about 5:00 o'clock a.m. or a little after" by the ringing of the motel night bell. At the door a girl who appeared "just plain excited" told him that she had been raped. Berg gave the girl a dime and observed her place a call at a nearby pay phone booth.

At 5:14 a.m.[1] a Ms. Christofferson, records clerk at Eugene Police Department, received an emergency line telephone call from someone who identified herself as "Anita Roberts" and stated that she had been raped about 20 minutes[2] earlier by a black man in his early twenties who was wearing a printed jacket; she described the man as about 5'8'' in height and weighing about 140-150 pounds. She said she was calling from a pay phone booth at Louie's Restaurant on

---

[1]State's exhibit 3, a tape recording of the telephone call, contains, in addition to the call itself, a statement by an unidentified male voice that the call was received at 5:13 and 33 seconds a.m. The person answering the call, Ms. Christofferson, stated at one point that the call was received at "about quarter after five" and at another point testified that the call was received "at about 5:50."

[2]Officer Blankenship and Dr. DeFrank each testified that Roberts told them that she was raped about 3:45 a.m.

[ 769 ]

Franklin Boulevard,[3] about one-fourth of a block east of the Rose Motel. She also said that the rapist had fallen asleep underneath a tree adjacent to the motel. Christofferson's testimony was that "The voice on the phone was very upset."

At 5:22 a.m. Officer Blankenship was dispatched to the area of Franklin Boulevard and Eleventh Avenue regarding a reported rape. At that location Blankenship contacted Roberts; his testimony was that Roberts

"* * * seemed very upset, and I just don't know how to explain it. She was just really upset and nervous, and I couldn't calm her down at first. I would have to, you know—she would go really fast, and I would have to tell her to repeat it and to slow down.

"* * * * *

"* * * The first thing she said was she had been assaulted and raped by a Negro male, and that he had fallen asleep after the rape, and she ran away. That was her first statement as brief as she could.

"* * * * *

"* * * then she pointed to the campus area near 11th and Franklin, and advised that the Negro male was still asleep under the tree over there as far as she knew.

"Q. Was she still shook up?
"A. Yes.
"Q. How long did you talk to her?
"A. Oh, probably three minutes."

Blankenship was joined by Officers Mattoon and Baker; Roberts led them to the site of the alleged rape. They found defendant who appeared to be asleep underneath a tree. Blankenship pointed at defendant, who was about three feet away, and asked Roberts if the defendant was the one who had raped her and Roberts said "Yes." The defendant was arrested. Concerning defendant's Miranda warnings, the testimony of Officer Baker was as follows:

"Q. Where was the advice of rights in relation to taking him into custody?

[3]The caller at first said she was on Eleventh Avenue but later agreed with the suggestion of Ms. Christofferson that it must be Franklin Boulevard. The restaurant is located in the area of Franklin Boulevard and Eleventh Avenue.

[ 770 ]

"A. I took him down to my patrol vehicle after he was handcuffed and everything and read him his rights there.

"Q. What rights did you read to the defendant?

"A. The Miranda warning rights.

"Q. What did he say to you when you were reading him his rights?

"A. He stated he did not understand and I did not have to read him that shit."

Baker said the defendant was alert when he was talking to him. Without being questioned, the defendant, after being taken to city hall, volunteered statements, including: "How can you rape a hitchhiker?" and, "We just laid." The court did not suppress these volunteered statements. Thereafter, Baker testified that he attempted to *readvise* defendant of his rights and "probably finished" doing so. Baker further testified that defendant said he understood all of his rights and that defendant then stated, "* * * 'I admit, the lady and I was together. We laid in the trees and the next thing I knew, you guys were here.' * * *"

Defendant was taken to the police department interview room, where Detective VanHorn arrived at 7:30 a.m. The defendant was sleeping when VanHorn entered the room. The detective awoke defendant and about a minute later began talking to him. Under direct examination VanHorn testified as follows:

"Q. Did you have occasion to advise him of his rights; that is, the defendant?

"A. I started to advise him of his rights.

"Q. What happened then?

"A. He advised me that he had already been advised of his rights. He understood them and he would talk to me.

"Q. Who was that now? The defendant?

"A. That was the defendant.

"Q. Did you have occasion to question him after that?

"A. Yes, I did.

"Q. During the course of the questioning, did he

ever express any interest, lack of interest in talking to you?

"A.   No, he did not.

"Q.   Did he ever invoke any of his rights?

"A.   No, he did not."

The interrogation lasted about 30 minutes. On cross examination VanHorn testified that defendant was groggy when he was first awakened but then testified that:

"* * * I gave him a chance where he could wake up and realize that he was awake, why I was there, identified myself, and he was, in fact, awake and, in my opinion, knew that I was talking to him, what I was talking about. He recognized me."

At about 6:50 a.m. Detective Virginia Hunt made contact with Roberts at City Hall. Hunt testified that Roberts told her "she had never had intercourse previously." Hunt said:

"* * * In my opinion, she was extremely emotionally upset to the point that she was just physically shaking. She was crying. Later when I was talking to her, she had difficulty with voice clarity * * *."

Hunt's interview with Roberts lasted from about 6:50 to about 7:20 a.m. after which she took her to the hospital.

At about 7:30 a.m. at the hospital, Roberts was interviewed and examined by Dr. DeFrank, who said: "She was obviously upset, tense, anxious and crying during part of the interview, at least." She told the doctor that she had been struck in the left jaw, knocked down, and raped. The doctor said that Roberts' injuries were the most he had ever seen in a rape victim.

Also attending Roberts was Sharon Percell, a hospital nurse. Percell testified of Roberts that:

"* * * She looked haggered, like she had been crying. Her clothes were rumpled. Her hair was messed up.

"* * * * * *

"* * * She was very, very upset. She was crying.

"Q. Explain that kind of thing.

"A. She was very nervous, and she cried off and on through the whole time she was there."

Plaintiff's assignments of error are predicated on the trial court's rulings which suppressed (1) statements made by defendant to Officers Baker and Van Horn for want of Miranda warnings; (2) hearsay statements by Roberts to Christofferson, Blankenship, Hunt, Percell, and Dr. DeFrank;

## MIRANDA WARNINGS

The trial court ruled "[t]hat those statements allegedly made by the defendant in response to interrogation by police officers Baker and VanHorn be suppressed from use as evidence inasmuch as the court finds that the State has failed to show that the defendant was advised of and was aware of his constitutional rights at the time of said police questioning."

The trial court found that Officer Baker's testimony was "equivocal as to whether he gave Mr. Jones any advice of rights or not the second time." The court then stated:

"* * * So, we have a situation that Officer Baker advised the defendant of his rights, and the defendant affirmatively said that he did not understand them, and the next thing we have is no affirmative evidence, or at least the evidence does not reach the posture of a reasonable doubt or reasonable preponderance that Officer Baker, in fact, gave Mr. Jones his full rights. Detective VanHorn affirmatively says he did not. They apparently both relied upon Mr. Jones' statement that he did, in fact, understand his rights.

"So, we have Mr. Jones saying, first, 'I did not understand them,' then no affirmative evidence of new advice of rights, and then Mr. Jones saying, 'Yeah, I understand my rights.' I don't think we can accept that.

"Miranda says the awareness of rights is not to be presumed. They say,

"* * * we will not pause to inquire in individual

cases whether the defendant was aware of his rights without a warning being given.'

"If you are going to accept the premise that the state goes on as to this second set of statements, then all you would have to do is to, as I understand it, go to a defendant and say, 'I want to read you your rights.'

"And he says, 'Oh, I know my rights. I'll talk to you.' And then that would be all you would need, and you don't have any idea what the defendant subjectively thought his rights were. * * *"

In *State v. Wright,* 251 Or 121, 124, 444 P2d 912 (1968), our Supreme Court found an understanding waiver from defendant's statement "I've heard all this before" and said:

"The fundamental purpose of *Miranda,* as we understand it, is not to hamper the police in their duties at the investigatory stage of a committed crime, but to insure that a person accused of crime has knowledge of his right not to speak in the absence of counsel. * * *"

In the instant case it is undisputed that Officer Baker read the "Miranda warning rights" to the defendant at the patrol vehicle and that defendant then employed gutter language and said that he did not understand them.

However, when Officer VanHorn undertook to advise defendant of his rights defendant stated that he had already been advised of them and he understood them and would talk. This occurred approximately two hours after Officer Baker had read the Miranda rights to defendant.

The trial court found Officer Baker's testimony "equivocal" as to whether he gave defendant any advice of rights the "second time" and suppressed *all* statements which the defendant made to either of the officers "in response to interrogation."

We hold, as a matter of law, that the initial reading of the rights by Officer Baker coupled with the express acknowledgment by defendant to Officer VanHorn, that he understood his rights constituted an under-

standing waiver. *State v. Wright, supra.* Accordingly, the statements thereafter made to Officer VanHorn are admissible in evidence.

## VICTIM'S STATEMENTS AND IDENTIFICATION

The trial court ruled

"[t]hat statements made by the alleged victim to Barbara Christofferson, Officers Blankenship and Hunt, and to Nurse Percell and Dr. DeFrank are not spontaneous declarations and, on that ground, are not admissible as evidence. * * *"

This ruling excludes the tape recording of the telephone call by Roberts to clerk Christofferson at the Eugene Police Department except for that portion consisting of Roberts' complaint that she had been raped concerning which matter there is no challenge. This telephone call was made immediately after Roberts received a dime from motel manager Berg to report the alleged rape to the police which she did forthwith. The trial court found the statements to Berg to be "spontaneous declarations"[4] but suppressed Roberts' report to the police except as above noted. The state contends that the "whole material contained within that tape is admissible as an excited utterance."

To qualify as an "excited utterance" the causative event must be sufficiently disruptive to suspend the declarant's reflective processes. The alleged rape was such an event. In *State v. Hutchison,* 222 Or 533, 537, 353 P2d 1047 (1960), our Supreme Court examined the rationale of the "spontaneous declaration" exception to the hearsay rule and said:

"* * * The utterance is really an effusion. Being spontaneous in nature, the declaration is free from the elements of design, contrivance and self-service which at times color testimony given from the witness stand. The

---

4
"Where the declaration, act or omission forms part of a transaction which is itself the fact in dispute, or evidence of that fact, such declaration, act or omission is evidence as part of the transaction." ORS 41.870.

[ 775 ]

credibility of a declaration of that kind is not dependent solely upon the veracity of the declarant. The pain, excitement or horror of the event had stilled the powers of reflection and had enabled the event itself to speak through the tongue of the declarant. It is the startling event rather than the will of the declarant that propelled his tongue. If one who sought the truth were required to make a choice between the spontaneous declaration and the testimony under oath of the declarant he possibly would choose the former. The circumstances under which the spontaneous declaration was made commend it as a reliable index to the truth."

The crucial question is: Was the telephone call which lasted about five minutes really an "effusion"? Approximately half of that time was consumed by Christofferson's efforts to positively identify the telephone booth from which Roberts was calling. Roberts was confused about the street names in the area. The fact that there were questions and answers in the course of the call does not per se preclude a finding that it was admissible as a "spontaneous utterance." *State v. Crawley,* 242 Or 601, 607, 410 P2d 1012 (1966). Our determination requires not only consideration of the time interval between the exciting event and the declaration, but also, whether it was made at the first opportunity subsequent to the occurrence and before the powers of reflection had been regained.

In *State v. Wilson,* 20 Or App 553, 559-60, 532 P2d 825 (1975), we held that a statement made by the prosecutrix more than an hour after the rape was admissible as a "spontaneous exclamation" and said:

"* * * Although the time interval between an exciting event and a subsequent statement may be of a duration which would ordinarily give rise to reflective thought, where there is some evidence that the declarant did not in fact engage in any such reflection—e.g., a nervous, upset or distraught condition at the time of the statement together with a reasonable basis for continuing emotional upset—the statement will be admitted as a 'spontaneous exclamation.' * * *"

In the instant case the tape recording reveals

Roberts' tremulous, quavering voice; gasping sighs; and halting responses to elementary questions, all of which indicate that her statements were impelled by the event without intervening reflection. This was her initial attempt to describe the occurrence and she seemed so genuinely distraught there is no doubt that her reflective powers were still benumbed by the event. She was still in a state of extreme mental shock. Officer Blankenship who contacted Roberts at the telephone booth within approximately "two minutes" following completion of her call described her as "very upset." Officer Hunt who interviewed Roberts almost two hours after the call in question said "she was extremely emotionally upset to the point that she was just physically shaking." We hold as a matter of law that the statements contained in the tape recording constituted "excited utterances" and are exempt from the hearsay rule.

In so holding, we are mindful that in ruling on evidence of this kind, great deference should be accorded to the finding of the trial court. *State v. Hutchison, supra.* Roberts' subsequent statements may have become subject to reflection so their admissibility was within the discretion of the trial court to properly suppress them.

Affirmed in part, reversed in part, and remanded for trial.