Argued and submitted November 10, affirmed December 29, 1980

STATE OF OREGON,
*Respondent,*
*v.*
DAVID MERLE HAWKINS,
*Appellant.*
(No. 26775, CA 18003)
621 P2d 660

J. Marvin Kuhn, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender.

James C. Rhodes, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James M. Brown, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

Before Gillette, Presiding Judge, and Roberts and Campbell, Judges.

ROBERTS, J.

Gillette, P. J., dissenting opinion.

**ROBERTS, J.**

Defendant was convicted by a jury verdict of rape in the first degree. He assigns as error the admission into evidence of a statement made by the victim and the failure of the court to give a cautionary instruction with reference to the testimony of the victim because it was uncorroborated. We affirm.

The victim is the 13-year-old stepdaughter of defendant. The incident that gave rise to this case occurred when defendant was driving the victim to a friend's house, but instead drove to an isolated area and parked. Defendant forced the girl to have sexual intercourse with him and then drove her home. On the way home defendant told her "not to tell anybody." When she arrived home she was crying and looked "scared-weird," according to her grandmother. When her mother asked why she was crying, she told her mother, as she said defendant had told her to do, that it was because defendant was leaving. Within a few minutes of arriving home, she told her 13-year-old uncle, Kevin, that she wanted to talk to him. From 10 to 15 minutes later she told Kevin what had happened. According to Kevin, she never told him that her stepfather had raped her, but only "that he said he was going to rape her." The victim testified she "just went kind of like slightly through it and he got what I was trying to tell him." At trial, defendant objected to Kevin's testimony of that conversation. The issue is whether the victim's statement to Kevin, given within 20 minutes of her return home after the incident, is admissible as a "spontaneous exclamation" exception to the hearsay rule. We conclude that it is.

Defendant recognizes the exception as set out in *State v. Kendrick,* 239 Or 512, 515-16, 398 P2d 471 (1965), where the Supreme Court said:

> "Statements known as spontaneous exlamations [*sic*] fall within a generally recognized exception to the rule. In order to qualify under this exception, the following have to exist: (1) there must be some occurrence startling enough to produce nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must be before there has been time to contrive and misrepresent and while reflective powers are yet in abeyance; (3) the utterance must relate to the circumstances of the startling

occurrence preceding it. (See § 1750, Wigmore on Evidence, 3rd ed.)"

However, defendant maintains that the challenged testimony here does not meet the requirement of point (2) above because the victim's statement was made after she had time for reflective thoughts.

Kevin's testimony is as follows:

"Q [PLAINTIFF'S COUNSEL]: What did you notice about Marie when she first came in?

"A [KEVIN SPECK] She was crying.

"Q Okay. Is this unusual for her?

"A Yeah.

"Q How did she look? Was she just kind of crying happily or what did she look like?

"A Well, I don't know. She was kind of crying hard.

"Q Did she appear to be happy or sad or what?

"A Well, sad.

"Q Did you have any chance to talk to her then?

"A No. Not right then.

"Q What did you do when she came in the house?

"A Well, she came in and set down.

"Q Where did she sit?

"A In the rocking chair in front of the TV.

"Q What happened then?

"A I don't know. She was still crying.

"Q Okay. Did you ever have — did you ever see what [defendant] was doing during this time or do you know what he was doing?

"A He was standing by the stove.

"Q Okay. He came in the house?

"A Yeah. For a minute, I guess.

"Q Okay. Did he say anything that you recall?

"A No. Not to me.

"Q Did he appear to be happy or sad or angry or anything?

"A Just normal.

"Q Now, did you ever have a chance to talk to Marie about what happened to make her cry?

"A Yeah.

"Q Okay. How did — did she tell you at one time she wanted to talk to you or how did this come about?

"A Yeah. She said she wanted to talk to me later when they came in.

"Q When did she say —

"A After she got up out of the chair I was in the dining room and I asked her what was wrong. So she said she wanted to talk to me later.

"Q How long had she been home when she said that?

"A Just a few minutes.

"Q Did some people leave the house sometime after that?

"A I'm pretty sure mom, David and Carolyn did.

"Q About how long after Marie made that comment to you did they leave?

"A Just a couple of minutes.

"Q Okay. Do you know where they were going?

"A I don't know. I thought they were going to town.

"Q Okay. Did you talk to Marie after these adults had left?

"A Yes. Yeah.

"Q Was there anybody else in the house that you know of?

"A Yeah. Her little sister, Bom-Bom.

"Q Where was her little sister?

"A She was in the front room.

"Q Where did you talk?

"A First in the front room, then her bedroom.

"Q In Marie's bedroom?

"A Yeah.

"Q What was Marie acting like when you started talking to her?

"A Well, she was calmed down a little bit.

"Q Was she crying at all?

"A Yeah. Kind of.

"Q Okay. How did you kind of start talking about whatever happened?

"A I asked her what was wrong.

"Q Just what did she say?

"MR. SLOTHOWER: I'm going to object on the basis of hearsay, your Honor.

"THE COURT: Overruled. You want a continuing objection to this?

"MR. SLOTHOWER: Yes. I do.

"THE COURT: All right. Go ahead.

"Q [PLAINTIFF'S COUNSEL]: After you asked her what was wrong, Kevin, what did she say?

"A [KEVIN SPECK]: Well, she didn't want to tell me at first.

"Q  What did she say?  'I don't want to talk to you,' or what?

"A  Well, I don't know. I don't recall — really remember.

"Q  How do you know she didn't want to tell you? Did she walk off?

"A  She just sat there.

"Q  She wouldn't say anything at all?

"A  Not at first.

"Q  What did you do? Did you keep asking her questions or something?

"A  Yeah.

"Q  What did you ask her?

"A  Kept asking her what was wrong.

"Q  Okay. Did she finally say something to you?

"A  Yeah.

"Q  What did she say — finally say?

"A  Well, she told me he took her down to the fish hatchery, told her to take her clothes off and she said, "No." And then I guess he raped her. That's what she said.

"Q  Okay. Now, this — did this conversation all take place in the living room?

"A  No. It was in the bedroom for a little while.

"Q  How did you — did it take more than five or ten seconds to talk about this?

"A  Yeah.

"Q  How did you get into the bedroom? Were you kind of walking around talking about it or what happened?

"A  Yeah. She was sitting down for a while. Then she got up and started walking around and started walking into her room then and we talked about it.

"Q  Where were you when she told you she thought she had been raped?

"A  I think we were in the front room.

"Q  Did she ever start crying or laughing or acting unusual when she was telling you this?

"A  Not really.

"Q  She was just kind of crying?

"A  She was yelling at Bom-Bom a little bit.

"Q  How did you feel when she told you this?

"A  Got mad."

In *State v. Wilson,* 20 Or App 553, 558-59, 532 P2d 825 (1975), explaining *State v. Kendrick, supra,* we said:

"The determination of whether a statement is of an impulsive or unreflective nature requires consideration of

several factors among which the lapse of time between the exciting event and the particular utterance is generally regarded as of primary significance. There is a judicial reluctance to characterize statements as 'spontaneous' as the length of time increases between the event and the utterance. Obviously, no inflexible rule gauged to that interval may be employed to determine whether any particular declaration was or was not the product of reflective thought. Rather, each case will depend upon an examination of the facts peculiar to it, and should be resolved by the exercise of a judicial discretion which takes into account factors such as the condition of the victim at the time the statement was given, whether the statement was made in response to an inquiry by some other person, whether the declaration was made at the first opportunity subsequent to the alleged occurrence, and the age or mentality of the victim, in addition to the time element. *See Zeller v. Dahl,* 262 Or 515, 499 P2d 1316 (1972); *Bosin v. Oak Lodge San. Dist.,* 251 Or 554, 447 P2d 285 (1968); Annotation, 19 ALR2d 579 (1951).

After a review of rape cases allowing admission of "spontaneous" statements made within one to two hours following attacks, we stated:

"The following principle may be inferred from these decisions: Although the time interval between an exciting event and a subsequent statement may be of a duration which would ordinarily give rise to reflective thought, where there is some evidence that the declarant did not in fact engage in any such reflection — e.g., a nervous, upset or distraught condition at the time of the statement together with a reasonable basis for continuing emotional upset — the statement will be admitted as a 'spontaneous exclamation.' * * *" 20 Or App at 559-60.

*Wilson* allowed the admission of a statement in the case of a 14-year-old, raped by her father, who escaped and reported the crime to a passer-by about an hour after the occurrence. In a later rape case, *State v. Jones,* 27 Or App 767, 557 P2d 264 (1976); *rev den* (1977), we found a victim's telephone call to the police 1-1/2 hours after a rape to be the first opportunity she had to describe the incident subsequent to its occurrence and before her powers of reflection had been regained; her statement to police was thus admissible.

■   In applying our previous tests to the facts of this case, we find the following: the victim took the first chance

she had on returning home to tell Kevin, who appears to be the only person present she felt she could confide in,[1] that she needed to talk to him. Both Kevin and the victim's grandmother testified that when the girl returned home, immediately after the incident, she was extremely upset and crying hard. In the time between her return home and the time an opportunity to talk with Kevin presented itself, approximately 10 to 20 minutes, the victim apparently cried, sat in a rocking chair, then paced around the house. Taking into account the victim's continuing distress, her age and relation to the defendant, along with his admonition to her not to tell, her delay in speaking until defendant left the premises is understandable. The description of the event to Kevin, made some 20 minutes after she returned home, and after her mother, grandmother and the defendant had left, was her first reasonable opportunity to explain the event. Thus, Kevin's testimony as to the conversation, though clearly hearsay, is, under the *Jones* and *Wilson* tests, admissible as a "spontaneous exclamation" exception to the rule generally prohibiting the introduction of such testimony.

The dissent, in characterizing the victim's awkward explanation of the event to her 13-year-old uncle as "careful" and "couched" not only overlooks the dynamics of a situation in which a 13-year-old girl is relating to a 13-year-old boy the details of her own rape, but baldly accepts as a fact that in 20 minutes the victim did "patently * * * exercise * * * 'reflective powers.'" The dissent thus fails to appreciate the trauma a female experiences when subjected to the assault which has been termed "both a blow to the body and a blow to the mind."[2] As one respected author has noted, "The victim's reaction to the rape is usually one of shock, disbelief, emotional breakdown, guilt, shame, degradation, humiliation or embarrassment. She is unable to talk about what has happened. * * *"[3]

---

[1] The victim apparently never told either her mother or her grandmother of the incident; they were informed by others.

[2] S. Brownmiller, Against Our Will: Men, Women & Rape 424 (1975).

[3] E. Hilberman, The Rape Victim 35 (1976), cited in "Will Rape Ever Be A Crime of The Past?: A Feminist View of Societal Factors and Rape Law Reforms,"

■ With reference to defendant's assignment of error on the court's failure to give a cautionary instruction with reference to the corroboration of the testimony of the victim, "[t]here is no rule in this state that either requires or prohibits such a comment on the evidence." *State v. Yates,* 239 Or 596, 599, 399 P2d 161 (1965). Kevin's testimony was admissible and thereby corroborative. Further, such an instruction is addressed to the discretion of the court.

Affirmed.

**GILLETTE, P. J.,** dissenting in part.

Cases such as the one before us are usually not easy, and this one is no exception. I regretfully conclude that the majority's decision concerning the admissibility of the victim's statements to her young uncle is incorrect, and therefore respectfully dissent.

I agree that the passage of time is not talismanic in these cases. Even if it were, the amount of time involved here is so short that no reasonable rule based upon time alone would bar the evidence in question here. However, there is a second criterion derived from *State v. Kendrick,* 239 Or 512, 515-516, 398 P2d 471 (1965), *viz.,* the requirement that the victim's utterance "* * * must be [made] * * * while the reflective powers are yet in abeyance," which is not met. The evidence here shows that the victim in telling her uncle her story was careful not to say directly that she had been raped. She couched her story in such terms as to permit him to draw that inference. This is patently the exercise of "reflective powers." I note also that she did not seize upon the first opportunity to tell her story. I would not, however, base an opinion on this fact alone, since the defendant was present at the time the victim could have spoken to her mother or grandmother, and the fear or loathing the victim doubtless felt toward the defendant at that time may have played a role in her silence.

9 Golden Gate U L Rev. 581, 596 (1978-79). *See also Brownmiller, supra,* at 422, 404, defining rape as "a deliberate violation of emotional, physical and rational integrity * * * a hostile, degrading act of violence * * *" and noting "[t]here is no uniform response to a rape, or a uniform time for recovery."