## UNITED STATES, Appellant and Cross–Appellee,

v.

## Floyd C. WOODFOLK, Appellee and Cross–Appellant.

### Nos. 92–CO–460, 92–CM–756.

District of Columbia Court of Appeals.

Argued Oct. 5, 1994.

Decided April 10, 1995.

Elizabeth Trosman, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, Eric H. Holder, Jr., U.S. Atty., and John R. Fisher, Robin C. Ashton, Sydney Hoffmann, John F. Cox and Helen M. Bollwerk, Asst. U.S. Attys., were on the brief, for appellant and cross-appellee.

James E. McLeod, appointed by the court, for appellee and cross-appellant.

Before STEADMAN, SCHWELB and FARRELL, Associate Judges.

STEADMAN, Associate Judge.

During a search of Floyd Woodfolk's home, police found a 9 mm semiautomatic Luger ("Tech 9") with a loaded magazine in a white plastic bag near Woodfolk's bedroom. In test-firing the gun to determine operability, it was discovered that the magazine found in the gun was defective in that it failed to properly feed bullets into the chamber of the gun; however, when a new properly functioning magazine was inserted, the gun readily fired multiple rounds.

The jury found Woodfolk guilty of possession of a prohibited weapon (machine gun) in violation of D.C.Code § 22–3214(a); possession of an unregistered firearm in violation of D.C.Code §§ 6–2311(a) and 6–2376; and unlawful possession of ammunition in violation of D.C.Code §§ 6–2361 and 6–2376.[1] However, notwithstanding the jury verdict, the trial court entered a judgment of acquittal on the charge of possession of a prohibited weapon (machine gun). It ruled that the gun with its defective magazine did not meet the statutory definition of a "machine gun" under D.C.Code § 22–3201; viz., "any firearm which shoots automatically or semiautomatically more than 12 shots without reloading."

Before us are cross-appeals. The government challenges the trial court's legal interpretation of the statutory definition of a machine gun, as applied to the facts here. Woodfolk challenges the trial court's evidentiary ruling admitting as an excited utterance the 911 tape of the telephone call from Woodfolk's girlfriend which led to the police search.[2] We hold that the trial court erred

---

1. In addition, Woodfolk was convicted in an immediately following bench trial of possession of drug paraphernalia, also found during the search, in violation of D.C.Code § 33–603(a).

2. We find no merit in Woodfolk's other argument that the evidence gathered from his house should be excluded because the government failed to meet its burden of proof that the third-party consent of Woodfolk's girlfriend was voluntary and sufficient in scope. The trial court made extensive findings of fact on this issue when it denied the pretrial motion to suppress evidence.

in entering the judgment of acquittal and reinstate the jury verdict of guilty on the count of possession of a prohibited weapon (machine gun). We affirm Woodfolk's other convictions as well.

## I.

On May 25, 1991, at 9:48 a.m., a woman named Wendy Carter called 911 from a house in Southeast D.C. Ms. Carter told the dispatcher that she would like to have police sent to her boyfriend's house, because she wanted to leave. When the dispatcher asked whether Ms. Carter's boyfriend wouldn't let her go, Ms. Carter responded, "No—he, he owns a gun." She answered yes when the dispatcher asked if she had seen the gun. The dispatcher then asked, "So he has a gun on you?" and Ms. Carter replied, "He's here and he owns a gun. I want to leave and I'm scared he might do something to me." She identified her boyfriend as Floyd Woodfolk, and when the dispatcher asked for a description, Ms. Carter said, "... could you please hurry?" The dispatcher then relayed the information to several police officers, who responded to the call.

When the police arrived, Ms. Carter met them at the front door. She was wearing bedroom attire and appeared to be scared and nervous. Ms. Carter asked the officers to find the gun and led them down to the basement. When they got downstairs, the officers saw Woodfolk lying in bed, in a makeshift bedroom area that was partially partitioned off from the rest of the room. The room contained a crib for the couple's baby, who was in the home, and there was a large amount of women's clothing strewn about. After a continued search of some minutes, following various suggestions of Ms. Carter, the officers found the white bag, inside of which was the gun, containing a magazine loaded with 18 rounds of 9 mm ammunition, near the bedroom area under the rear of the interior steps leading down into the basement.

On October 9, 1991, Officer David Proulx test-fired the gun, using the magazine that had been recovered from Woodfolk's home. Officer Proulx found that the weapon was operable in the sense that it could fire a single bullet, but that the magazine would not feed properly for semi-automatic repetition. He concluded that the magazine probably had a bent lip.

A few days later, Officer Walter Dandridge of the firearms section of the Criminal Investigations Division performed a second test-fire of the gun. In order to complete this test, Officer Dandridge removed the magazine that was found with the gun, and used another magazine made for that type of weapon, which was in the firearms section's collection. Officer Dandridge fired the gun for 13 consecutive shots without reloading. He testified at trial that there was no question that the gun was capable of firing 13 rounds when it was equipped with a magazine that functioned properly.

## II.

■ D.C.Code § 22–3214(a) outlaws the possession of certain specified weapons, including "any machine gun." [3] A machine gun is defined for purposes of the prohibited weapons statute as "any firearm which shoots automatically or semiautomatically more than 12 shots without reloading." D.C.Code § 22–3201(c). Woodfolk in substance makes the argument, which the trial court accepted, that the magazine must be considered an integral part of the firearm itself. On that theory, he invokes, as did the trial court, our holding in *Curtice v. United States*, 488 A.2d 917 (D.C.1985). That case

"A finding of voluntariness is essentially factual. On appeal our review is limited: a trial court's finding that a search is consensual is upheld unless such a finding is clearly erroneous." *Oliver v. United States*, 618 A.2d 705, 709 (D.C. 1993). The relevant findings here are fairly derived from the record, and support the trial court's ruling. Woodfolk relies heavily on the decision in *Washington v. United States*, 585 A.2d 167 (D.C.1991), but that case dealt only with an argument of exigent circumstances, and the

court specifically stated at the outset that there was no issue of consent in the case.

3. In addition to machine guns, the prohibition in subsection (a) includes sawed-off shotguns, blackjacks, slingshots, sand clubs, sandbags, switchblade knives, metal knuckles, and silencers and mufflers. Certain exceptions are contained for possession by military personnel and the like.

involved a pistol with a defective spring that prevented the pistol from firing. Although the problem was readily rectified by simply stretching the spring, we held that since it required expert knowledge to diagnose what the defect was and since no evidence was presented to show that the defendant had such knowledge, the government had failed to prove beyond a reasonable doubt that the pistol was "operable."

We cannot agree that as a matter of law, a magazine must be deemed an integral part of a machine gun so that the "expertise" test of *Curtice* is determinative.[4] Officer Dandridge, who was qualified as an expert on the subject of firearms testing, testified that a magazine was not an integral part of the machine gun itself but rather an accessory. He testified that when buying a machine gun, one often will get two magazines to go with the weapon. Similarly, Officers Lucas and Baxter, who responded to the radio run,[5] testified without objection that the magazine was not a part of the gun but was separate. Officer Baxter described the magazine as "just a reservoir for holding ammunition." Officer Lucas said that the magazine was "an accessory, separate in itself." Other testimony and pictures shown to the jury also demonstrated the ready removability and separate nature of the magazine.

Congress enacted D.C.Code § 22–3214(a) in 1932, prohibiting the mere possession of certain weapons, "to enforce drastically a prohibition against carrying particularly dangerous weapons within the District of Columbia." *Worthy v. United States*, 420 A.2d 1216, 1218 (D.C.1980). The legislative intent was to strengthen the existing law and tighten controls over the possession of dangerous weapons. *United States v. Parker*, 185 A.2d 913, 914 (D.C.1962). We explained the legislature's rationale by stating that "[t]he weap-

ons listed in subsection (a) are so highly suspect and devoid of lawful use that their mere possession is forbidden." *Worthy, supra* at 1218 (citing *United States v. Brooks*, 330 A.2d 245, 247 (D.C.1974)).

Similarly, we looked at the legislature's intent when we interpreted a D.C. statute that required registration of all firearms within the District, outlawed possession of unregistered firearms, and specifically stated that registration certificates could not be issued for machine guns.[6] We concluded that when the legislature excluded machine guns from those firearms which could lawfully be registered,[7] the legislature was "concerned primarily with the inherent fire power of certain weapons, not with the question of firearm modification after registration. The rationale supporting this provision [is] to prohibit residents of the District from possessing guns whose fire power has legislatively been deemed to be dangerous...." *Fesjian v. Jefferson*, 399 A.2d 861, 865 (D.C.1979). Hence, we held, even though the machine guns in question were presented for registration with clips holding less than 12 rounds, "[s]ince the guns in question, by virtue of their structure, had the capability to shoot the prohibited number of rounds without reloading, they may properly be found to be unregisterable." *Id.* We think a somewhat similar focus underlies the statute before us.

It is true that the registration statute in *Fesjian* defines a machine gun as "any firearm which shoots, is designed to shoot, or can be readily converted or restored to shoot ... semiautomatically more than 12 shots without manual reloading." D.C.Code § 6–2302(10). This is a fuller definition than that contained in § 22–3201(c) and could lead to different results in particular cases. *See Townsend v. United States*, 559 A.2d 1319 (D.C.1989) (unregistered pistol missing firing

---

**4.** To the extent that the appeal might have turned on that issue, the parties took sharply different views whether Woodfolk, a former police officer, could be deemed to have the necessary expertise to know that the problem would be with the magazine. It does seem somewhat anomalous in any event to say that the definition of a "machine gun" would turn on the characteristics of its possessor, so that one person might lawfully possess what another person could not, however relevant the question of expertise may be when

the charged offense is that of unlawfully carrying a pistol outside one's home or business, as in *Curtice*.

**5.** Officer Lucas was also present at both test-firings.

**6.** D.C.Code §§ 6–2311 *et seq.*

**7.** D.C.Code § 6–2312.

pin and spring mechanisms was unlawfully possessed under D.C.Code § 6–2311(a) even if not "operable" for purposes of D.C.Code § 22–3204). However, in *Fesjian* we were dealing with constitutional issues and addressed the statutory purposes in broad terms. Given the expansive definitional language that, as we noted, "clearly" prohibited registration of the firearms in question; *Fesjian,* 399 A.2d at 865, we had no occasion to address further the issue presented in this case.

We observe that the 1932 Act imposing the flat ban on possession of machine guns also contained a provision barring the carrying of a pistol without a license, now appearing as D.C.Code § 22–3204. We have construed that provision as requiring proof that the pistol in question be "operable." *Anderson v. United States,* 326 A.2d 807 (D.C.1974), *cert. denied,* 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 659 (1975).[8] Nonetheless, "one is guilty of carrying a pistol without a license even if he or she carries an unloaded, but unlicensed, pistol." *Comber v. United States,* 584 A.2d 26, 51 n. 39 (D.C.1990) (en banc). *See also Morrison, supra,* 417 A.2d at 412 n. 2.[9] Rather, the inquiry is whether the firearm "was a 'device *capable* of propelling a projectile by explosive force.'" *Townsend v.*

*United States, supra,* 559 A.2d at 1320 (emphasis in original).[10] If this is so with respect to a statute that limits only the carrying of an unlicensed pistol in public,[11] surely the same considerations apply with at least equal force to a provision imposing an absolute ban on possession.[12]

In sum, we think the legislative intent here was to focus on the core components of what in common parlance constitutes a "machine gun." *See Lee v. United States,* 402 A.2d 840, 841 (D.C.1979) ("a firearm is *by common usage* a device *capable* of propelling a projectile by explosive force" (emphasis added)). Analogies can be dangerous, but the situation here might be likened to, say, a statute that banned outright the possession of a "camera." If a person were found in possession of a camera with a defective film canister, we think the statute nonetheless could be fairly construed to have been violated. For the reasons set forth above, we conclude a similar analysis applies here. "We cannot, therefore, rule as a matter of law that the [weapon] in this case did not fall within the proscription of [§ 22–3214]. The question was [at the very least] properly left to the jury." *Rouse v. United States, supra,* 391 A.2d at 792.[13]

8. We have noted that it is "somewhat anomalous for the court to have translated the government's custom of proving operability into an element of the offense." *Morrison v. United States,* 417 A.2d 409, 412 n. 2 (D.C.1980). However, we have incorporated the requirement of "operability" into the definition of "sawed-off shotgun," the possession of which is prohibited by § 22–3214. *Washington v. United States,* 498 A.2d 247 (D.C. 1985).

9. We perceive in these statements no indication that the carrier of an unloaded gun must at least have in his or her immediate possession the requisite ammunition. *See, e.g., Gaulmon v. United States,* 465 A.2d 847, 849 (D.C.1983) (conviction under § 22–3204 where pistol not loaded and no indication that any ammunition was found).

10. A similar rationale underlies our cases holding that a disassembled pistol may nonetheless in certain circumstances be "operable." *Rouse v. United States,* 391 A.2d 790 (D.C.1978). Thus, it is significant that the requirement is that the weapon be "operable," not "operative," the former connoting capability, the latter a state of immediate readiness.

11. At the time that these cases were decided, § 22–3204 only prohibited the carrying of an unlicensed pistol *in public,* because the statute contained a provision permitting the carrying of an unlicensed pistol in one's home or place of business. That provision was eliminated by emergency legislation on June 22, 1994. D.C.Code § 22–3204(a) (Supp.1994).

12. Woodfolk argues that since the defective magazine had to be removed and replaced by a functioning magazine, the gun required "reloading" within the meaning of D.C.Code § 22–3201. We see no basis to conclude that even though the gun unloaded is a machine gun within the meaning of the statute, it somehow loses that status when something defective is added to it.

13. Our ruling here is consistent with those in other jurisdictions that have dealt with the issue under various statutory provisions. *See State v. Davis,* 711 P.2d 232, 234 (Utah 1985) (defendant's .22 caliber pistol, although unloaded and accompanied by a faulty ammunition clip, could be loaded and fired and was, therefore, a dangerous weapon and a firearm); *State v. Boster,* 4 Kan.App.2d 355, 606 P.2d 1035, 1040 (1980) (.25 caliber automatic weapon is a firearm even

## III.

■ The trial judge admitted the 911 tape into evidence as an excited utterance. The admissibility of a spontaneous utterance is committed to the sound judicial discretion of the trial court, and we will reverse only if the ruling is clearly erroneous. *Alston v. United States*, 462 A.2d 1122, 1128 (D.C.1983). In order for a statement to qualify as an excited utterance, there must be (1) a startling event which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a sufficiently short period of time after the occurrence to ensure that the declarant did not reflect upon the event and possibly invent a statement, and (3) circumstances which in their totality suggest spontaneity and sincerity of the remark. *Price v. United States*, 545 A.2d 1219, 1226 (D.C.1988).[14] Appellant argues that there is no evidence in this case of a specific startling event, and therefore no evidence whether the declaration was made without time to reflect.

We may assume for present purposes that the mere making of the statement itself can-

not alone serve as sufficient evidence of the occurrence of a startling event.[15] However, only in the unusual case will there be a complete lack of evidence, direct or circumstantial, to indicate whether an event has occurred that could account for the excitedness of the utterance. "Fortunately, only a very few cases need actually confront this knotty theoretical problem if the courts view the independent evidence concept broadly, as they should where the circumstances and content of the statement indicate trustworthiness." 2 McCORMICK ON EVIDENCE § 272, at 217–18 (4th ed. 1992).

■ As we have often noted, "[c]ircumstantial evidence may be equally as probative as direct evidence." *Gayden v. United States*, 584 A.2d 578, 579 (D.C.1990), *cert. denied*, 502 U.S. 843, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991). Here, the trial court was presented with far more than a disembodied abstract statement. To the contrary, much was known and could be inferred about the surrounding circumstances. The trial court, in finding that the 911 tape constituted

---

though officers failed to find clip or ammunition within reach of defendant); *Davis v. State*, 499 P.2d 1025, 1038 (Alaska 1972) (absence of a clip in a .45 caliber automatic is not a mechanical defect rendering pistol inoperable), *rev'd on other grounds*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *United States v. Melancon*, 462 F.2d 82, 95 (5th Cir.) (Russian machine pistol was a machine gun when evidence showed that it would fire and that only the magazine was missing), *cert. denied*, 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 487 (1972); *United States v. McCauley*, 601 F.2d 336, 341 (8th Cir.1979) (Japanese type–96 light machine gun was a machine gun even though it lacked a magazine). The two cases from other jurisdictions on which Woodfolk relies are actually not inconsistent with our ruling. In *People v. Woods*, 202 Misc. 562, 114 N.Y.S.2d 611 (1952), the court found that a weapon was not a machine gun because it was missing two vital component parts. In *York v. State*, 56 Md. App. 222, 467 A.2d 552 (1983), *cert. denied*, 299 Md. 137, 472 A.2d 1000 (1984), the court found that a gun with a cylinder that would not revolve was a firearm, because it could be fired by a particularly strong person, or could be fixed in about a minute with simple tools.

14. We agree with the government that preponderance of the evidence is the proper standard of proof for determining the admissibility of an excited utterance. *See, e.g., State v. Carlson*, 311 Or. 201, 808 P.2d 1002, 1007, 1011 (1991). Pre-

ponderance of the evidence is the most commonly accepted standard in determining the admissibility of evidence. 1 McCORMICK ON EVIDENCE § 53 n. 8 (4th ed. 1992). *See also Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987) (for admissibility determinations that hinge on preliminary factual questions, the Court has traditionally used the preponderance standard); *Wells v. United States*, 407 A.2d 1081, 1089 (D.C.1979).

15. However, it has been noted that "[t]he modern trend is to take the declaration itself 'as sufficient proof of the exciting event.'" 4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S EVIDENCE § 803(2) (1994). *See also* 2 McCORMICK ON EVIDENCE § 272 (4th ed. 1992) ("Under generally prevailing practice, the statement itself is taken as sufficient proof of the exciting event, and therefore the statement is admissible despite absence of other proof that an exciting event occurred.") *Compare United States v. Moore*, 791 F.2d 566, 571 (7th Cir.1986) (citing McCORMICK AND WEINSTEIN) *with People v. Burton*, 433 Mich. 268, 445 N.W.2d 133, 138–144 (1989) (disagreeing with WEINSTEIN) *and Commonwealth v. Barnes*, 310 Pa.Super. 480, 456 A.2d 1037, 1040 (1983) (not allowing an excited utterance without independent evidence; the dissent cites McCORMICK).

an excited utterance, noted the declarant's expressed fear, the presence of a gun in the house, and the sense of urgency (both in Ms. Carter's tone of voice and in her request "please hurry").[16] The court discounted the argument that the presence of the gun could be a startling event only when it was first brought into the house; no matter how long the gun had been in the house, the court ruled, it was clearly causing Ms. Carter acute concern at the time that she made the 911 call. Furthermore, the trial court found that the circumstances of Ms. Carter's calling the police supported the existence of a startling event, since a person does not normally call the police when she merely wants to leave a house. Finally, the record contained further evidence corroborating the existence of a startling event: the officers found Ms. Carter in a nervous and upset frame of mind, and the officers did in fact locate the gun in the house. Every detail of the startling event need not have been known as long as sufficient circumstantial evidence demonstrated that some startling event occurred and it was in a state of nervous shock following that event that Ms. Carter made the 911 call.[17]

Accordingly, the entry of a judgment of acquittal on the count of possession of a prohibited weapon is vacated and the case remanded to the trial court with instructions to enter a judgment of conviction on that count upon the verdict of the jury and to impose appropriate sentencing. The other convictions are affirmed.

*So ordered.*

16. The trial court was entitled to consider the declarant's tone and tenor of voice on the tape recording in determining the issue of excited utterance. *See, e.g., State v. Jones,* 27 Or.App. 767, 557 P.2d 264, 270 (1976); *United States v. Mejia–Velez,* 855 F.Supp. 607, 614 (E.D.N.Y. 1994); *People v. Cook,* 159 Misc.2d 430, 603 N.Y.S.2d 979, 986 (1993); *cf. Price v. United States,* 545 A.2d 1219, 1226 (D.C.1988).

Appellant's argument that Ms. Carter's statements on the phone could not have been an excited utterance, since some of her statements were in response to questions from the dispatcher, is meritless. *See Young v. United States,* 391 A.2d 248, 250 (D.C.1978).

17. Appellant's procedural objections to the playing of the 911 tape must also fail. Appellant claims that the trial court erred by playing the tape only once for the jury, but since appellant did not argue below that the tape needed to be played more than once for reliability, and in fact objected to the jury's request to hear the tape again, he cannot be heard to complain now. Finally, appellant's argument that his rights under the Confrontation Clause were violated, since he had no opportunity to cross-examine Ms. Carter, is meritless. *See White v. Illinois,* 502 U.S. 346, 355–56, 112 S.Ct. 736, 742–43, 116 L.Ed.2d 848 (1992) (Confrontation Clause does not require excluding from trial evidence that is embraced by firmly rooted exceptions to the hearsay rule, such as spontaneous declarations). As for appellant's arguments asserting that "other crimes" evidence was improperly introduced, we think that the material on the tape could be considered to be directly relevant to the crime at issue, linking appellant to the gun. *See, e.g., Marshall v. United States,* 623 A.2d 551, 554 (D.C.1992).