Michael A. WELCH, Appellant,

v.

UNITED STATES, Appellee.

Nos. 93–CF–355, 94–CO–1368.

District of Columbia Court of Appeals.

Argued June 7, 1996.

Decided June 25, 1996.*

Richard Seligman, Washington, DC, for appellant.

Ann K.H. Simon, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Elizabeth Trosman, Michael D. Brittin, and Carolyn K. Kolben, Assistant United States Attorneys, were on the brief, for appellee.

Before KING and REID, Associate Judges, and GALLAGHER, Senior Judge.

* The decision in this case was originally issued as a unpublished Memorandum Opinion and Judg-ment. It is now being published by direction of the court.

PER CURIAM.

After a jury trial, appellant Michael Welch was convicted of two counts of rape while armed, in violation of D.C.Code §§ 22–2801 and –3202 (1989 Repl.). He was sentenced to two consecutive terms of fifteen years to life in prison. Several months after his sentence, Welch filed a motion for a new trial, alleging ineffective assistance of counsel under D.C.Code § 23–110 (1989 Repl.). An evidentiary hearing was held on one of his nine allegations of specifications of deficient performance by his counsel, and the others were resolved without an evidentiary hearing. The trial court denied the motion, rejecting all of Welch's arguments. Welch filed a timely direct appeal, as well as a timely appeal of the trial courts's denial of his motion for a new trial. On appeal, he contends: (1) in admitting hearsay statements of Ms. Gibson under the spontaneous utterance exception, the trial court denied him his Sixth Amendment constitutional right to confrontation; (2) he was denied effective assistance of trial counsel in violation of his Sixth Amendment right to counsel; (3) the trial court abused its discretion in denying him a continuance to investigate the government's plea agreement with Lomax Hughes who was with him on the night of the rape; (4) the trial court abused its discretion in cutting off his right to cross-examine a witness regarding questions central to the defense theory of consent; and (5) the government engaged in prosecutorial misconduct in making certain statements during opening and closing arguments. We affirm.

## FACTUAL SUMMARY

Tracy Gibson knocked on the door of a home occupied by government witness De-marius Miller at approximately one a.m. on September 10, 1990.[1] Mrs. Miller, her husband and son were asleep. Gibson called out: "Could you please call the police because I have been raped." Mrs. Miller called 911.[2] Then she and her husband "went downstairs and opened the door." Mrs. Miller described Ms. Gibson as "very emotionally upset. She sat on the bottom of our porch steps. She was hunched over and just crying, really distraught. . . . She was crying, and she was holding herself, shaking and crying uncontrollably. She was very emotionally upset." Neighbors two doors away came to investigate because of the loud crying. According to Ms. Miller, Ms. Gibson did not appear to be "insincere" and her conduct did not seem to be "contrived."

When a policeman arrived at the Millers' home, he spoke with Ms. Gibson.[3] Officer Eugene Witherspoon, then a twenty-four year veteran of the Metropolitan Police Department, testified that as he arrived at the Millers' house on September 10, 1990, at about one seventeen or one eighteen a.m., he "saw a woman sobbing on the steps." She continued to cry "very loudly" and to sob "continuously" when the officer identified himself. After a few seconds, Ms. Gibson said she had been raped. "She had her arms around her . . ., her head down, and she was crying uncontrollably." Eventually Ms. Gibson told the officer that she had been raped by two men. She described the men and their car in detail. In between crying and sobbing spells, Ms. Gibson told the officer that while she was at a bus stop at Martin Luther King Avenue and W Street, S.E. around eleven forty-five or eleven fifty five, a man got out of a car, "pointed a gun at her and forced her in the car."[4] When Officer Sheryl Harley–Holzwart arrived at the Mil-

1. Ms. Gibson died on April 15, 1991, after choking on food. Welch's trial took place in late November 1992.

2. The trial court admitted the 911 tape recording of Mrs. Miller's call into evidence without objection.

3. Several police officers and a detective who interviewed Ms. Gibson on September 10, 1990, testified at trial. They recounted what Ms. Gibson had told them about the events surrounding her rape, described her appearance and demean- or when they saw her, and explained their respective roles in the investigation of the rape. These officers and detective included Officers Eugene Witherspoon, Sheryl Harley–Holzwart, Maureen Walsh, and Jeffrey Brown, and Detective Juanita Terrell.

4. Charles Young testified that Ms. Gibson had spent the evening with him. She was wearing shoes, a red T-shirt, three gold rings, a gold necklace, and a small gold chain around her neck.

lers' home, Officer Witherspoon asked her to accompany him with Ms. Gibson to the place where the rape occurred.[5] They drove approximately one block and a half to the 6200 block of Chillum Place, N.W.; Chillum Place intersects with Sheridan Street where the Millers lived and contains several warehouses where tractor trailer trucks park. Officer Witherspoon contacted the police department sex squad, and began to obtain more details from Ms. Gibson about what happened. Welch and his co-defendant, Lomax Hughes, purchased drugs from a night club while Ms. Gibson was in their car. They warned her that if she emerged from the car, she would be killed. They took Ms. Gibson to the Chillum Place warehouse area, and both men raped her. Welch and Hughes left Ms. Gibson at the warehouse, got back into their car, threw items belonging to her, as well as empty Red Bull beer cans out of their vehicle.

A veteran detective from the Metropolitan Police Department's Sex Offense Branch, Detective Juanita Terrell, who had investigated sex crimes for nineteen and a half years, questioned Ms. Gibson at the warehouse site. According to her, Ms. Gibson said she left the home of a friend, Charles Young, around eleven fifty-five p.m. on the night of the incident and walked to the bus stop. While she was standing there, two men drove up in a vehicle. One man ordered her to get into the car; the driver had a silver handgun. She was blindfolded for part of the trip. The men stopped at a night club on Georgia Avenue, N.W., the Turntable, and "purchased some reefer." They drank Red Bull beer and smoked the reefer. They then drove to the rear of the Chillum Place site and ordered her to remove her clothes.

They ripped her T-shirt and snatched off her jewelry. They told her to "go in between two parked trucks" where they took turns raping her.[6] They warned her "to remain [at the warehouse] and not to leave or they would kill her." They threw out items from the car which belonged to Ms. Gibson and to them as they drove away. During her conversation with Detective Terrell, Ms. Gibson "kept sobbing constantly on and off." Officer Maureen Walsh, a Metropolitan Police Department officer, testified that she documented the crime scene and gathered evidence from the warehouse site. The items collected included a Red Bull Malt Liquor can, and a condom, as well as panties and a bra belonging to Ms. Gibson.

Officer Jeffrey Brown drove Ms. Gibson to D.C. General Hospital at approximately two thirty a.m. on September 10, 1990. He testified that she cried continuously during the trip to the hospital and was "distraught." After a two hour wait, Dr. Kwasi Adofo Debra spoke with and examined Ms. Gibson. According to the doctor, she was "tearful, crying and withdrawn. She said she had been raped, and she complained of lower abdominal pain and vaginal discomfort." When asked at trial whether "there was vaginal penetration of Ms. Gibson within a recent time period of [his] examination," Dr. Debra replied in the affirmative. He also said he noticed no signs of any substance abuse by Ms. Gibson—alcohol, drugs or medicine.

Two FBI special agents from the DNA Analysis Unit testified at trial. They indicated that DNA analysis revealed semen on Ms. Gibson's shorts identified as belonging to Welch. The DNA evidence was admitted without objection.

5. Officer Harley–Holzwart testified at trial that Ms. Gibson's "hair was a mess; ... [h]er face was swollen; her eyes were red and she was crying." Her "shirt was just ripped up the front." Ms. Gibson would sob uncontrollably at times. "She was shaking a lot, just violently shaking."

6. Lomax Hughes who was in the car with Welch, testified for the government. He indicated that he and Welch had forcible sex with Ms. Gibson. Ms. Gibson resisted their advances, and Hughes pulled out a gun and pointed it at Ms. Gibson during the rape. One of the men penetrated Ms. Gibson twice and the other once. One used a condom and threw it on the ground. Hughes, who was indicted with Welch, testified against Welch in exchange for a plea to one count of assault with intent to commit rape and one count of misdemeanor theft. After a separate trial on severed counts, he was convicted of rape while armed, armed robbery, sodomy and felony threats. He was given an aggregated prison sentence of approximately twenty-six years, but moved to reduce his sentence. The government opposed his motion. The record is silent as to the disposition of Hughes' motion.

## ANALYSIS

■ First, Welch argues that his Sixth Amendment constitutional right to confrontation was denied when the trial court admitted the statements of Ms. Gibson under the spontaneous utterance exception to the hearsay rule. *See White v. Illinois,* 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992). As we have recognized previously, "[w]hether a statement constitutes a spontaneous utterance depends upon the particular facts of each case, and its admissibility as such is within the sound discretion of the trial court." *Smith v. United States,* 666 A.2d 1216, 1222 (D.C.1995) (citations omitted). We have established a three-prong test to determine whether statements qualify as an excited or spontaneous utterance:

> (1) a startling event which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a sufficiently short period of time after the occurrence to ensure that the declarant did not reflect upon the event and possibly invent a statement, and (3) circumstances which in their totality suggest spontaneity and sincerity of the remark.

*United States v. Woodfolk,* 656 A.2d 1145, 1150 (D.C.1995) (citing *Price v. United States,* 545 A.2d 1219, 1226 (D.C.1988)); *see also Nicholson v. United States,* 368 A.2d 561, 564 (D.C.1977). Welch focuses on the third prong of the test and claims that the statements Ms. Gibson made to the police were not spontaneous reactions to a startling event, but constituted the officers' own narrative accounts.[7] We disagree. The trial court conducted a two day pre-trial hearing on June 30 and July 2, 1992, during which extensive testimony was taken regarding whether Ms. Gibson's statements qualified for the excited utterance exception to the hearsay rule. In his Memorandum and Order of July 7, 1992, the motion judge concluded that Ms. Gibson's statements qualified for the exception. He stated, *inter alia:*

> There are ample circumstances indicating the sincerity and spontaneity of the statements. Her statements were disjointed,

but consistent; she narrated without appearing to have to think of what to say; she was emotional throughout. In addition, plenty of evidence corroborates her statements, including the items found on the scene (which she could not have seen from the police car); her torn shirt; the absence of a bra; and the evidence seized from Hughes' house and car.

Moreover, as the court said in *Smith,* "the totality of the circumstances, which the trial court must consider in assessing the third element [of the excited utterance test], necessarily takes into account the circumstances involved in the first two elements." 666 A.2d at 1223. Based on the totality of the circumstances in this case, as reflected in the record on appeal and the factual summary set forth above, we are satisfied that the trial court did not abuse its discretion or err in admitting into evidence the statements of Ms. Gibson under the excited utterance exception to the hearsay rule. Furthermore, since the statements of Ms. Gibson had "sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule," i.e., the excited utterance exception, the confrontation clause of the Sixth Amendment "is satisfied." *White v. Illinois,* 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992).

■ Second, Welch argues that his Sixth Amendment right to counsel was denied because of the ineffective assistance of his trial counsel. To prevail on this issue, Welch must show not only deficient performance by his trial counsel, but also that "the deficient performance prejudiced [his] defense." *Strickland v. Washington,* 466 U.S. 668, 669, 104 S.Ct. 2052, 2055, 80 L.Ed.2d 674 (1984). *See also Ready v. United States,* 620 A.2d 233, 234 (D.C.1993). We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 234. Welch complains that his trial counsel failed (1) to request that Ms. Gibson's sworn, written statement be admitted into evidence for impeachment purposes, and (2) to object to government witness statements about Ms.

---

7. Although he recognizes that the decision has been vacated and has no force of law, Welch relies upon *Lyons (Lewis) v. United States,* 622 A.2d 34 (D.C.1993), *reh'g en banc granted & opinion vacated,* 650 A.2d 183 (D.C.1994).

Gibson's credibility. The trial judge stated that both were "tactical decisions." *See Carter v. United States*, 475 A.2d 1118, 1123 (D.C.1984), *cert. denied*, 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985). Regarding the first, the trial judge also said: "[T]rial counsel's partial success in excluding the written statement was beneficial to the defendant's case, despite the inconsistencies it contained, since a substantially corroborative report of the rape was excluded as substantive evidence." In addition, with respect to the second decision, the trial court said the outcome of the trial would not have been different because "the weight of the evidence against the defendant was so overwhelming that it is inconceivable that these few [credibility] statements affected the outcome of the trial." We conclude that Welch failed to demonstrate deficient performance by his trial counsel, and even if he had, he failed to show that "there is a reasonable probability that, but for ... [any] unprofessional errors, the result [at trial] would have been different." *Ready*, 620 A.2d at 234 (citation omitted). *See also Webster v. United States*, 623 A.2d 1198, 1203 (D.C.1993).

 Third, Welch raises three other unpersuasive contentions. Contrary to his argument, the trial court did not abuse its discretion in denying Welch's request for a continuance to investigate the government's plea agreement with Lomax Hughes. Welch's main concern was his ability to adequately prepare for cross-examination of Hughes concerning the incentives for his plea agreement. At trial, Welch's counsel questioned Hughes at length about his plea arrangement; the amount of jail time he was facing; his age as well as the ages of his girlfriend and his son at the time of his anticipated release; and other matters. The trial court did not unduly restrict Welch's cross-examination of Hughes. Furthermore, as we stated in *Edelen v. United States*, 627 A.2d 968, 972 (D.C.1993): "[w]e ... accord the trial judge wide latitude as to whether to grant or deny a motion for continuance."

Similarly, the trial court did not abuse its discretion in disallowing a question as to whether a phrase in Officer Harley–Holzwart's notes implied that Ms. Gibson was a prostitute. There was no factual foundation for this question, and counsel for Welch had already posed several questions to the officer involving the sale of sex for crack cocaine and the possibility that Ms. Gibson had picked up Welch and Hughes. Hence, Welch's counsel was able to pose cross-examination questions relating to the defense theory of consent. "Although the right to cross-examine is ... inherent in the Sixth Amendment right to confrontation, '[the] extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court.'" *Springer v. United States*, 388 A.2d 846, 854 (D.C.1978) (citation omitted). On the record before us, we see no abuse of discretion.

Finally, Welch asserts that the government engaged in prosecutorial misconduct in its opening statement and closing argument.[8] Welch did not raise any objections in the trial court, and we review for plain error. *See United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). On the record before us, we cannot say that the prosecutor's opening statement and closing argument "so clearly prejudiced [Welch's] substantial rights as to jeopardize the fairness and integrity of his trial." *Irick v. United States*, 565 A.2d 26, 32 (D.C.1989) (citations omitted). For the foregoing reasons, we

*Affirm.*

---

8. Welch labels as prosecutorial misconduct (1) the failure of the government to deliver on its opening statement promise that Darin Hagins would testify about Welch's boastful admission of the rape and robbery of Ms. Gibson; and (2) the government's suggestion in its closing argument that the jury should assist in the District's struggle against crime. The trial court told the jury *sua sponte*, that "its job ... [was] to decide this case based only on the evidence" before it.