**Andre T. PRICE, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 85–1089.**

District of Columbia Court of Appeals.

Argued Oct. 19, 1987.
Decided June 27, 1988.

---

Lawrence M. Baskir, Washington, D.C., appointed by this court, for appellant.*

Charles M. Steele, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty. at the time the brief was filed, Michael W. Farrell, and Thomas J. Motley, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FERREN and ROGERS, Associate Judges, and REILLY, Senior Judge.

REILLY, Senior Judge:

This appeal from a conviction for assault with intent to kill while armed[1] presents some close questions under the rules of evidence, including a challenged ruling permitting the government to impeach its own witness under D.C. Code § 14–102 (1981), and the admissibility as an "excited utterance" of a telephone conversation describing a violent event which allegedly occurred three hours before the call was placed. After examining the record, we discern no error in the challenged rulings of the trial court and affirm.

## I.

The transcript of the trial reveals that what the government proposed to portray as the tale of a jealous lover soon became the tale of a fickle mistress as a result of the unexpected behavior of the principal prosecution witness. The lady in question, a Cheryl Wilson, was an eighteen year old at the time of the incident that resulted in appellant's indictment. She lived with her mother and her six month old infant in a house at P Street, N.W., just off North Capitol Street. She was employed as a checker in a Holly Farms outlet on Georgia Avenue. The undisputed evidence disclose that Franklin Baylor, Jr., a young man then employed by the city as a water meter reader, dropped into that shop, struck up an acquaintance with her, and arranged their first date—a visit to her home late that evening where he stayed for about two hours. The following night, they renewed this tryst—a sexual relationship having been established. On the third day, the young lady, in a telephone conversa-

---

* Appellant was represented at trial by a different lawyer.

1. D.C.Code §§ 22–501, –3202 (1981 & 1987 Supp.). Appellant was also convicted of carrying a pistol without a license, *id.* § 22–3204 (1981), and destruction of property, defined as a misdemeanor by *id.* § 22–403. As no separate grounds for reversing these convictions were argued, our disposition of the appeal from the verdict of guilty on the principal offense also affirms the convictions on the foregoing counts.

tion, explained that she was scheduled to work late, but suggested that they should meet again at her place shortly after midnight.

Unbeknownst to Baylor, he was not the only man currently in Cheryl Wilson's life. As she subsequently told the jury, she was seeing Andre Theodore Price, appellant here, on an almost daily basis at the time and was still in love with him fifteen months later when she was called to the witness stand. She testified that he was the father of her infant boy, and that on the day after Baylor's second visit, he had walked her to work.

While driving in-town later that same day to keep his midnight rendezvous, Baylor noticed as he turned from First Street into the Wilson block, that a couple standing at the corner were engaged in what seemed to be a struggle. He passed them and stopped his car when he suddenly saw Cheryl Wilson and a man he did not recognize approaching the rear of his car from the sidewalk. Before Baylor could step out, the stranger pushed Miss Wilson to the ground, pulled a pistol from his belt, and fired several shots in Baylor's direction, shattering the side windows of the car and wounding Baylor in the arm and shoulder. The latter quickly threw his car in gear and headed for the southeastern sector of the District where his parents and two brothers lived. Upon arriving there—some thirty to forty-five minutes later—he aroused his family. His father and a brother, Marquette Baylor, lifted him from his car into another automobile. The father then drove this car cross-town to George Washington University Hospital where the wounded son was admitted for emergency surgery. In the meantime, Marquette had taken the wheel of his brother's vehicle and followed his father to the hospital.

While the patient was being treated by the surgeons, the brother, Marquette, having learned from Franklin, Jr. the circumstances of the shooting and the telephone number of Cheryl Wilson, placed a call to her from a public telephone in the hospital. When she answered, he told her that his brother had been shot and asked her what had happened. Sounding as if she was in tears, she blurted out, "I didn't know he was gonna do that," and kept repeating the words. Marquette then asked her "who did it?" When he persisted in this question, she gave the name, "Theodore Price." In testifying about this, Marquette was unable to pinpoint the exact time his call was placed, but estimated that it occurred less than two hours after his wounded brother had come home.

Being told by his son of the telephone conversation, Baylor Sr. visited the Wilson house the next morning where he was received by Cheryl and her mother. He talked with them for about a half-hour. In response to his questions, Cheryl informed him that the man who fired the shots was the father of her baby. She stated his name was Theodore Price and provided his address to Baylor. He jotted this down on a piece of paper.[2]

Apparently, the Baylors passed on this information to the police, for a day or two later, Detective Driskill was assigned to investigate the matter. He interviewed Cheryl several times at her house, but she proved to be evasive. About ten days after the shooting, she learned that Driskill had summoned appellant Price to his office for questioning. She telephoned him to ask if he was going to arrest him. According to his testimony, he responded by saying that he could not do so unless she gave him the information he had been seeking. Eventually, he asked her specifically if Price was the man who shot Baylor. She answered in the affirmative. Later that day, Price was arrested and charged.

When the matter was presented to the grand jury, Miss Wilson was one of the

2. In testifying about this visit at trial, Baylor was unable to recall the address, until shown this document, which was then received as an exhibit. When Cheryl was on the stand, she admitted that such a visit had occurred, but professed inability to recall the details of the conversation, and denied providing Price's address. Her mother was not called as a witness.

witnesses called by the government. Apparently somewhat evasive when she first appeared,[3] she went back to the stand after a recess. In response to a direct question, she said that she knew the person who shot Franklin Baylor. The next question and answer were:

Q. Who was it?

A. Andre Price shot him. Can I go?

## II.

At trial, the government's first witness was the victim of the shooting, whose testimony has already been described. He was unable to describe the features of his assailant, explaining that the shock of the sudden gunfire had blurred his recollection. Neither counsel asked him if he was able to identify appellant, who was sitting at defendant's table, as the man with the gun.

When Miss Wilson took the stand, she corroborated Baylor's version of the incident. But when asked to give the name of the gunman, she stated that he was a person unknown to her, who had accosted her as she left her house, attempted to snatch her purse when she refused to give it to him, and pushed her to the ground when Baylor was parking his car. She testified that after firing his pistol and seeing Baylor drive off, the stranger fled in the opposite direction, whereupon she reentered her house and went to bed.

Asserting surprise, the government sought permission from the court to impeach Miss Wilson with her grand jury testimony, stating that it had expected Miss Wilson to testify consistently with her grand jury identification of appellant as Baylor's assailant. Defense counsel object-

ed, stating that surprise was lacking. He told the court that during the luncheon recess preceding Miss Wilson's testimony, he had handed opposing counsel a sworn statement obtained by a prior attorney for the defense from Miss Wilson, in which she disclaimed ability to identify the person she had seen firing at Baylor's car. The court overruled the objection, provided a proper foundation was laid. When confronted with the testimony she gave the grand jury, she explained that she had lied on that occasion because she "was threatened."

After a weekend recess, Miss Wilson was recalled by the government to the stand and interrogated, over defense objection, as a hostile witness. She again said that her answer naming appellant as the gunman was false, and given because "that's what they wanted to hear."[4] The government then laid a foundation for the witness it expected to call by asking her if she could recall being telephoned by the victim's brother and subsequently interviewed by his father and Detective Driskill. She agreed that all these events had occurred, but denied or could not remember saying anything on these occasions which incriminated appellant Price. She professed inability to recollect just what she had said to her callers, but conceded being upset and weeping during the telephone call from the brother on the night of the shooting. She also admitted that she had gone to see her "boyfriend" (appellant) the very next day.

Immediately following Miss Wilson's impeachment with her prior inconsistent grand jury statements, the trial judge, *sua sponte*, instructed the jury that (a) the grand jury testimony could be considered

3. Although minutes of the grand jury proceedings, or relevant segments thereof, were made available to counsel, these were not included in the record certified for appeal. Thus, her complete testimony is not part of the record before us.

4. When further questioned about who threatened her at the grand jury proceedings with forfeiting custody of her baby, she indicated that she had inferred this would be the conse-

quence of possible jailing, when reminded of the penalties which could be imposed for perjury. Except for this sparse reference, the record is devoid of anything to explain why the witness felt threatened. At the time Miss Wilson was recalled, she had the benefit of counsel appointed by the court at the request of the prosecutor, who had pointed out, after the jury had been dismissed for the weekend, grounds for belief that perjury had been committed.

only for the purpose of assessing her veracity as a witness, but (b) could not be considered as substantive evidence to prove the truth of such disclosure, *i.e.,* that appellant shot Franklin Baylor. The trial judge stated:

> Members of the jury, you have received information concerning statements that were made on other occasions for a limited purpose, not for the purpose of what might be the truth of the matter contained in those statements, but rather only for determining whether or not you can believe this witness' present testimony.

A similar instruction was repeated to the jury when the case was submitted to it.

The government then called Driskill, the senior Baylor, and Marquette Baylor to the stand; each testified as previously described as to how they learned from Cheryl Wilson the identity of Franklin Baylor's assailant. Defense counsel raised no objection to the admissibility of such testimony.

After the government rested, defense counsel moved for judgment of acquittal contending that the evidence the government had presented to prove appellant guilty of the offense charged in the indictment was inadequate. When asked by the trial court what direct evidence had been offered to prove identification, the government responded by contending, *inter alia,* that the testimony concerning the account of the shooting accident given by Cheryl Wilson when her telephone caller informed her that his brother had been wounded just two or three hours before amounted to an "excited utterance" and was therefore admissible as substantive evidence. The defense disputed that this testimony fell within this exception to the hearsay rule.[5]

After taking the matter under advisement, the court denied the defense motion, remarking that:

While the issue of identification is not one that is without legal difficulty. It appearing that if inferences are drawn on the circumstantial evidence, there would be sufficient evidence on this point to go forward.

Defense counsel's case was brief. He did not call defendant to the stand, but produced an alibi witness—a young man, describing himself as a close friend and neighbor of defendant, who testified that on the night the assault occurred, the latter had spent most of the late evening and early morning hours with him at his house watching television. On cross-examination the witness was unable to specify the precise date of this social occasion.

The defense also sought to call Susan Berman, the former counsel for appellant, who had taken the written statement from Cheryl Wilson to which counsel had alluded in his objection to the impeachment testimony. She apparently had withdrawn her representation before trial to accept a position in the Office of Corporation Counsel. Appellant's counsel, who had not indicated to opposing counsel or the court that Miss Berman would be a defense witness until after the government had rested its case, requested a recess when he discovered she was not in the courtroom. It appeared that Miss Berman had not been subpoenaed, but had left a telephone number with defense counsel. The court granted a short recess to enable the defense to try to locate her. When those efforts proved futile, the court ordered that she be paged in other courtrooms.

When about forty-five minutes elapsed and the witness was still unavailable, court was reconvened. Defense counsel stated that he objected to having to proceed—he then offered into evidence the document that Miss Wilson had signed at the Berman office, pointing out that when he had it

---

5. The government also argued that under the Federal Rules of Evidence, the Wilson testimony before the grand jury was admissible as direct evidence of identification. *See* FED.R. EVID. 801(d)(1)(A). As the court ruled such evidence admissible only to impair the credibility of the recanting witness, we need not pass upon the validity of this issue. *Cf. Thomas v. United States,* 530 A.2d 217, 221–26 (prior testimony of *unavailable* witness violates confrontation clause), *reh'g en banc granted,* 530 A.2d 226 (D.C.1987).

marked and shown to the witness, she had verified the signature as hers. Over government objection, the relevant portion of the document was admitted.

After closing arguments, the court submitted the case to the jury with lengthy instructions to which neither side objected.

### III.

Appellant contends that certain rulings of the trial judge amounted to prejudicial error. He focuses primarily on two challenged applications of the rules of evidence by the trial court: (1) the ruling which permitted the government to impeach its own witness with her contradictory grand jury testimony and prior inconsistent statements, and (2) the denial of the motion for acquittal, followed by an instruction permitting the jury to consider what the government described as an excited uttterance as affirmative evidence on the disputed issue of identity.

■ In this jurisdiction, a party's right to impeach its own witness is governed by D.C. Code § 14–102 (1981), which provides:

> When the court is satisfied that the party producing a witness has been taken by surprise by the testimony of the witness, it may allow the party to prove, for the purpose only of affecting the credibility of the witness, that the witness has made to the party or to his attorney statements substantially variant from his sworn testimony about material facts in the cause. Before such proof is given, the circumstances of the supposed statement sufficient to designate the particular occasion must be mentioned to the witness, and he must be asked whether or not he made the statements and if so allowed to explain them.

In attacking the grant of the government's request to impeach Miss Wilson with her grand jury testimony and other inconsistent statements, appellant asserts that because the prosecutor was aware of the reluctant nature of that testimony and he had been apprised after the trial was underway that the witness had previously given a statement to the defense to the effect that Baylor's assailant was a stranger to her, the prosecutor had not been "taken by surprise" by the answers she gave on direct examination. Before ruling, however, the court was informed by the prosecutor that he had checked with the witness and ascertained that she was aware of what she had ultimately told the grand jury, and consequently her recantation of such sworn testimony was unexpected. The court then allowed the prosecutor to go forward, provided a proper foundation was laid.

Such ruling was entirely proper under our holding in *Parker v. United States,* 363 A.2d 975 (D.C.1976). There defense counsel informed the court and the prosecutor just before trial that a government witness stated to him an account of the event in question that was inconsistent with the witness' prior grand jury testimony. *Id.* at 977. During trial, when the witness proffered testimony inconsistent with his prior grand jury testimony, the trial court allowed the prosecutor to impeach its own witness. In affirming the ruling of the trial court as proper, this court stated that a prosecutor was entitled to rely on the witness' prior testimony given under oath, under the presumption that the witness understood the ramifications of committing perjury. *Id.; see Gordon v. United States,* 466 A.2d 1226, 1229–31 (D.C.1983) (prosecutor allowed to impeach witness with prior inconsistent grand jury testimony). A valid claim of surprise is not defeated even though the witness "may have given a different version of the event" under informal circumstances. *Parker, supra,* 363 A.2d at 977 (statement given to defense counsel during personal interview).

The instant case is readily distinguishable from *Baker v. United States,* 324 A.2d 194 (D.C.1974), upon which appellant relies. At the *Baker* trial, a government witness, when called to the stand, repudiated a statement he had previously made to the police. The prosecution then impeached

him by getting him to admit he had made this inconsistent statement. But at a pretrial hearing he had also repudiated the earlier statement. On appeal, we held that there was no surprise, as the prosecutor must have been "positive" how the witness would testify on direct examination. *Baker, supra*, 324 A.2d at 198. In contrast to *Baker*, the inconsistent statement suddenly handed the prosecutor could scarcely make the prosecutor "positive" that the witness would recant her grand jury testimony, especially as that had been elicited from her after she had been uncooperative and evasive when she first appeared in that tribunal.

In bolstering his claim of error, appellant also leans heavily upon *Byrd v. District of Columbia*, 43 A.2d 46 (D.C.1945), and *Scott v. United States*, 412 A.2d 364 (D.C.1980). Neither case has significant bearing here. It is true that in *Byrd*, where a conviction for operating a lodging house without a license was reversed, the court was critical of a ruling which allowed the prosecutor, after an alleged tenant testified that he lived at the defendant's house rent free, to impeach the tenant with a prior statement that he was paying rent for his room, but the ground for reversal was that the trial judge had accepted the impeachment testimony as substantive proof of the allegation, rather than a factor detracting from the credibility of the witness. *Byrd, supra*, 43 A.2d at 48. As no other evidence, other than the pretrial statement, was adduced to demonstrate a landlord-tenant relationship, such use of the statement was held plainly improper under the limited purpose of the relevant statute,[6] and the con-

viction was vacated. *Id.* at 48–49. This is not the situation with which we are confronted, as the court here instructed the jury that it should consider the testimony received only for impeachment purposes to determine whether the witness could be believed.

The *Scott* case, like *Byrd*, also emphasizes that a prosecutor is permitted to impeach his own witness only if his testimony tended to injure or destroy the government's case. *Scott, supra*, 412 A.2d at 367–68. The impeachment testimony admitted here clearly met this condition, for at this stage of the trial, the witness, to the surprise of the government, had testified to a fact which tended to destroy its case, *viz.*, that an unidentified robber, not appellant, had fired the shots at complainant Baylor. Obviously, her new version of the incident was not merely inconsistent with her grand jury testimony, but would detract severely from the probative force of evidence later presented by the government that the eyewitness to the crime had spontaneously named appellant as the assailant in responding to an unexpected telephone call. Thus, under *Byrd v. District of Columbia, supra*, 43 A.2d at 48, the court properly allowed the government to impeach the witness it had placed on the stand.[7]

The pivotal question upon which this appeal turns is whether the crucial telephone statement was properly treated as an excited, spontaneous utterance which could be considered by the jury as substantive evidence against appellant. While such utterances have long been recognized by the authorities as exceptions to the

6. D.C. Code § 14–104 (1940), *now codified at* D.C. Code § 14–102 (1981), *supra.*

7. *In re L.D.O.*, 400 A.2d 1055 (D.C.1979), also cited by appellant, has little, if any, bearing on the issue. There the victim of a robbery, called by the prosecutor to testify that he had picked defendant's photograph from an array of pictures shown him prior to trial, said that his selection was far from positive. He was not asked to make a courtroom identification. He was impeached by testimony of the policeman who had shown him the photographs and who

told the court that the witness had expressed no reservations. *Id.* at 1056–57. As the victim was not asked to make a courtroom identification, it was apparent that the prosecution was not surprised by his failure to identify defendant. In reversing the conviction, this court merely applied the familiar rule that surprise is a pre-condition for impeaching one's own witness and that, in any event, the contradictory hearsay testimony was not substantive evidence of identification. *Id.* at 1057–58.

hearsay rule, the acceptance of a particular statement as a spontaneous utterance "depends upon the facts peculiar to each case." *Nicholson v. United States*, 368 A.2d 561, 564 (D.C.1977). The admission of a statement as falling within this category rests "in the exercise of sound judicial discretion" by the trial court, a ruling not easily disturbed on appeal. *Id.*

The elements that constitute a spontaneous utterance are (1) the occurrence of a startling event which "causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant" did not reflect upon the event and possibly fabricate a statement, and (3) "circumstances, which in their totality suggest spontaneity and sincerity of the remark." *Alston v. United States*, 462 A.2d 1122, 1126–27 (D.C.1983) (quoting *Nicholson, supra*, 368 A.2d at 564); *see generally* MCCORMICK ON EVIDENCE § 297 (3d ed. 1984).

The first element is not satisfied absent evidence that the declarant "suffered mental disturbance or shock as a result of the event." *Alston, supra*, 462 A.2d at 1127. If the declaration is "a calm narrative of a past event, it loses the character of a spontaneous utterance." *Id.* (citations omitted). However, if the evidence suggests that "the declarant was highly distraught and in shock at the time the statement was uttered," the requisite element that the declarant be in a "state of nervous excitement" is satisfied. *Alston, supra*, 462 A.2d at 1127 (citing *Wheeler v. United States*, 93 U.S.App.D.C. 159, 164, 211 F.2d 19, 24 (1953) (ten-year old girl, while still upset, went to grandmother's house about one hour after sexual assault), *cert. denied*, 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140 (1954)).

The record here demonstrates that the first of these conditions had been met. Certainly the sudden shooting and wounding of young Baylor could be described as a startling and shocking occurrence and the witness to it was obviously distraught when she learned the consequence of the affair. Significantly, Miss Wilson admitted being "upset and crying" when she talked to her telephone caller, thereby corroborating the latter's impression of her mental state when she responded to his questions.

Appellant does not dispute this aspect of the matter, but contends that the second condition for admissibility as an excited utterance was not satisfied as three hours had elapsed between the time of the shooting and the telephone call. During that interval the witness had returned home and gone to bed, and therefore, had time to reflect. Hence, appellant contends that whatever she said on the phone could not be viewed as a spontaneous revelation in the context of sudden shock.

This argument overlooks the fact, however, that not until Miss Wilson received the call did she learn that her most recent lover had been severely injured by the gunfire. Although she was aware that the shots had shattered the windows of the car, she might well have thought that the ability of the occupant of the car to start his motor so promptly and to drive out of gun range indicated that he had escaped unscathed. In view of the romantic relationship between witness and victim, the discovery that the latter had been wounded and hospitalized might well have caused her to burst into tears and triggered the words exculpating herself and incriminating her other lover.

In short, the record suggests that Miss Wilson's utterance responded to information she learned in the phone call, not to the shooting that had occurred earlier. Consequently, appellant's emphasis on her going to bed after the shooting, thus eliminating spontaneity, is beside the point.

In any event, while most of the cases where the exception to the hearsay rule has been sustained have dealt with utterances made "immediately after" or "within minutes" of the disturbing incident, a lapse of time is relevant, but not controlling on the issue of spontaneity precluding fabrication.

*Alston, supra,* 462 A.2d at 1127; *see Nicholson, supra,* 368 A.2d at 564–65 (statement made by victim thirty minutes after stabbing had a "strong likelihood of spontaneity and veracity"); *Bandoni v. United States,* 171 A.2d 748, 750 (D.C.1961) ("Time alone is not controlling in determining the spontaneity of an exclamation.").

"In all cases the ultimate question is whether the statement was the result of reflective thought or whether it was rather a spontaneous reaction to the exciting event." McCormick on Evidence § 297 at 856 (3d ed. 1984).[8] *Accord Young v. United States,* 391 A.2d 248, 250 (D.C.1978) (statements made by declarant to police officer near scene of the crime fifty minutes later constituted spontaneous utterances because they were "not given under the impetus of reflection"); *see also Bandoni, supra,* 171 A.2d at 749–50 (declarant still distraught over one hour after startling event); *Wheeler, supra,* 93 U.S.App. D.C. at 164, 211 F.2d at 24 (one hour).

In our opinion, the indicia of nervous shock and spontaneity in the instant case were sufficient to sustain as a proper exercise of the trial court's discretion the admission of the challenged statement as an excited utterance, particularly in a situation where such utterance, by incriminating a man whom the declarant professed to love, could scarcely be viewed as the product of reflection. Indeed, the evidence of the interview the next day—although received only for impeachment purposes—indicates that upon reflection, the witness had already regretted her disclosure.

The final jury instructions[9] show that the court was keenly aware of the limitations upon the testimony described by the prosecution as an excited utterance, and even left it to the jury to decide whether "it was an utterance made closely after the event, if you thought it was an excited utterance on which the party did not have an opportunity to reflect, but rather gave it forth immediately and without opportunity for reflection."

The government also argues that irrespective of the issue of spontaneous circumstances, appellant waived any right to object to the use to which this evidence was put, by failing to make any objection at the time the testimony was offered. Apparently anticipating this argument, appellant contends his trial counsel was "sandbagged" because he was lulled into thinking that the cautionary instruction given by the court when the impeachment testimony was admitted over objection, also applied to the subsequent testimony given by Driskill and the two Baylors. We do not regard this point as well taken, for unless a timely question or objection is voiced, it is not incumbent upon any litigant to state the reason why he is calling a particular witness to the stand. Moreover, in this instance, it is apparent from the colloquy on the motion for acquittal, that after the government urged that the telephone conversation could be treated as an excited utterance, defense counsel had an opportunity to dispute the categorization of this evidence as such and in fact did argue against the government's position. The court did not cut him off on the ground that this contention came too late, but took the arguments of both counsel under advisement before deciding to reject the motion. Thus, the trial court dealt with the excited utterance issue as if objection had been timely raised. We discern no error in the court's disposition of the question.

■ The record reveals that two other occurrences at trial, which appellant now urges as grounds for reversal, can scarcely be viewed as amounting to prejudicial error. He contends that the court's refusal to grant a continuance longer than forty-

---

8. Another learned authority on the rules of evidence has commented that "[t]o argue from one case to another on this question of 'time to devise or contrive' is to trifle with principle and to cumber the records with unnecessary and unprofitable quibbles." 6 Wigmore, Evidence § 1750 at 221 (Chadbourn Rev.1976).

9. At a bench conference, neither side objected to the instructions proposed by the court.

five minutes in order to enable defense counsel to track down Miss Berman, the missing witness, must be viewed as an abuse of discretion requiring a new trial. It is well settled that the granting of continuances once a trial gets underway is a matter committed to the discretion of the trial judge. *O'Connor v. United States,* 399 A.2d 21, 28 (D.C.1979). While a rigid insistence on proceeding without substantial delay may be overturned on appeal where such ruling substantially damages counsel's ability to defend, a strong showing must be made to establish its prejudical effect. *Id.* Here counsel not only failed to demonstrate that due diligence had been exercised to assure Miss Berman's appearance, but the very fact he sought to establish by calling this witness—*viz.,* that the impeached witness, Miss Wilson, had made a pretrial written statement consistent with her direct testimony—was accepted as truth when the trial court, overruling government objection, admitted as an exhibit the relevant segment of that written statement. Such ruling obviously cured whatever damage the defense suffered because of its inability to put Miss Berman on the stand.[10] Appellant's claim that he was nevertheless prejudiced because he was "left to counter live testimony with part of a piece of paper" borders on the frivolous, for "live testimony" by Miss Wilson described the circumstances which laid the foundation for introducing this exhibit.

■ We also are not persuaded—given the rulings and instructions of the trial court—that appellant was prejudiced in any meaningful way by one inaccurate description of the testimony against him by the government in closing argument. After stressing the importance of the evidence of the telephone call as affirmative proof of identification, the prosecutor then argued that what Miss Wilson was supposed to have said on the phone was "corroborated"

by what the elder Baylor and Detective Driskill were later told by Miss Wilson. Appellant correctly points out that the testimony of these two witnesses had been admitted only for impeachment purposes. Had the prosecutor merely referred to their testimony as factors which made the subsequent denial by Miss Wilson incredible, the summation would have been proper, but it is difficult to infer that its impact upon jury deliberations would have been any different. Thus, had defense counsel objected, the prosecutor could easily have corrected his inaccurate verbiage. Perhaps that is why appellant's trial counsel did not see fit to do so.

In the absence of timely objection, we do not perceive the prosecutor's comment as plain error. *Chapman v. United States,* 493 A.2d 1026, 1029–30 (D.C.1985); *see Logan v. United States,* 489 A.2d 485, 490 (D.C.1985); *Arnold v. United States,* 467 A.2d 136, 137–38 (D.C.1983); *Watts v. United States,* 362 A.2d 706, 709 (D.C. 1976) (en banc) (failure to object limits review to plain error).

*Affirmed.*

10. Such ruling was extremely favorable to the defense in view of holdings that the admission of consistent statements to rebut the probative force of prior inconsistent statements should be permitted only in exceptional situations. *See*

*Scott v. United States, supra,* 412 A.2d at 373; *Rease v. United States,* 403 A.2d 322, 327–28 (D.C.1979); *Coltrane v. United States,* 135 U.S. App.D.C. 295, 304, 418 F.2d 1131, 1140 (1969).