Gerald **BRYANT** and Kerwin J. Adams, Appellants

v.

**UNITED STATES, Appellee.**

Nos. 97–CF–1634, 97–CF–1764.

District of Columbia Court of Appeals.

Argued April 8, 2003.
Decided Oct. 14, 2004.

---

Peter H. Meyers, appointed by the court, for appellant Bryant.

Matthew C. Leefer, Boonsboro, MD, appointed by the court, for appellant Adams.

Chrisellen R. Kolb, Assistant United States Attorney, for appellee. Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, G. Bradley Weinsheimer, and Margaret A. Carroll, Assistant United States Attorneys, were on the brief for appellee. De-Maurice F. Smith, Assistant United States Attorney at the time the record was filed, also entered an appearance for appellee.

Before TERRY, GLICKMAN, and WASHINGTON, Associate Judges.

TERRY, Associate Judge:

Appellants Bryant and Adams, along with two co-defendants,[1] were charged in a twenty-six count indictment with multiple crimes of violence and crimes against property which occurred during the late evening and early morning hours of September 19 and 20, 1995. Among the charges were armed robbery, armed kidnapping, armed first-degree sexual abuse (rape), armed carjacking, destroying property, unauthorized use of a vehicle, possession of a firearm during a crime of violence, and conspiracy to commit some of the other charged offenses.

A jury trial began on February 25, 1997, for appellant Bryant and co-defendant Burie Garrett. After six days of testimony and four days of jury deliberations, the jury was unable to agree on a verdict with respect to Bryant, and as to him the court declared a mistrial; Garrett, however, was found guilty on eighteen counts.[2] Bryant was then retried with appellant Adams in a trial that began on May 2, 1997. At the conclusion of this second trial, Bryant was found guilty of all seventeen charges against him; Adams was also found guilty on the fifteen counts in which he was charged. Adams and Bryant were later sentenced to prison terms totaling twenty-three years to life and twenty-nine years to life, respectively. Both filed timely appeals.

Before this court, appellants argue that the trial court (1) abused its discretion by restricting the cross-examination of certain government witnesses, (2) erred in refusing to give a jury instruction on consent as a defense to the kidnapping and rape charges, (3) improperly admitted certain hearsay statements as excited utterances, and (4) failed to merge several of their convictions. We remand for resentencing because two of each appellant's convictions merge with two others, but we affirm the

---

1. Samuel Wilson and Burie Garrett were also named in the indictment as defendants. Wilson later pleaded guilty and testified for the government at the joint trial of Garrett and Bryant in February 1997. He also testified in Bryant's second trial with Adams in May 1997; indeed, he was one of the government's principal witnesses, along with Thea Williams. Our recitation of the facts in this opinion is based primarily on the testimony of Ms. Williams and Mr. Wilson at the second trial.

2. Garrett's conviction was later affirmed on appeal by this court in an unpublished memorandum opinion and judgment. *Garrett v. United States,* 790 A.2d 590 (D.C.1999).

judgment of conviction as to both appellants in all other respects.

## I. THE FACTS

The series of crimes in which appellants and their co-defendants engaged began sometime around 9:00 p.m. on September 19, 1995, when Bryant, Adams, and Garrett stole a burgundy and gray van from the parking lot of the True Gospel Tabernacle Baptist Church in Southeast Washington.[3] A few minutes later, the trio arrived in the stolen van at the home of Samuel Wilson. There they picked him up, and then, after first stopping at Garrett's home to retrieve three weapons in the hope of finding someone to rob,[4] the four men drove downtown to "get a prostitute."

As the group headed toward downtown along Massachusetts Avenue, S.E., the van, driven at the time by Garrett, pulled alongside seventeen-year-old Thea Williams, who (according to her own testimony) was working as a prostitute that evening. While she was standing on a street corner, one of the four defendants (she was not sure which one) put a gun to her side and forced her into the van. Once inside, Williams saw three other men in addition to the one who had forced her to get in. As they sped away, Wilson saw Adams and Bryant raping Thea Williams

in the rear of the van. Ms. Williams testified that one of the two appellants ordered her to perform oral sex on him, threatening to shoot her if she refused. She also testified that after Adams and Bryant raped her, Garrett and Wilson, who were both riding in the front seat, changed places with Adams and Bryant and also raped her while the van was driving around the city.[5]

The van eventually stopped at the Kenilworth Parkside Recreation Center, and there Garrett forced Williams to have sex with him again. The group then drove to an alley near Clay Terrace, and on the way Garrett had sex with Williams for a third time. After they reached the alley, the van was parked, and, according to Wilson, the other three took turns raping Ms. Williams again. After about forty-five minutes, the group decided that they needed more condoms, so Wilson drove to a nearby service station and bought some. There followed yet another episode of rapes by Adams, Bryant, and Garrett. When asked why he did not intervene to stop the repeated rapes of Ms. Williams, Wilson testified that he did not think anything was wrong with what his companions were doing because she was a prostitute.[6]

After purchasing still another box of condoms, the group decided to rob a man whom they had seen earlier in the area

**3.** The van belonged to Reverend Marvin Battle, who testified that he did not know either appellant, nor did he give either of them permission to use his van on the night it was stolen.

**4.** Wilson testified that the group obtained two shotguns, a double-barreled 10–gauge weapon and a 12–gauge Mossberg Trophy style, as well as a .380 semi-automatic handgun. Wilson admitted owning the double-barreled shotgun, but he said that the other weapons belonged to Garrett.

**5.** During his testimony, Wilson never admitted raping Thea Williams. There were, in

addition, other minor contradictions between the testimony of Williams and Wilson, concerning such matters as how many times the group stopped to buy condoms. Because none of the contradictions relate to the issues raised on appeal, we need not discuss them further.

**6.** In this, of course, he was mistaken. "Even a prostitute can be raped." *Brewer v. United States,* 559 A.2d 317, 321 (D.C.1989), *cert. denied,* 493 U.S. 1092, 110 S.Ct. 1163, 107 L.Ed.2d 1066 (1990).

selling clothes from his car. Ms. Williams also recalled hearing the group discussing a plan to rob someone when they stopped at a gas station earlier in the evening. Garrett, now driving the van, pulled alongside a white Volvo which the group had seen earlier parked on Division Avenue. Tyrone McDowney, who was standing between his own car and the parked white Volvo, noticed the van approaching slowly with its lights off. He testified that the van door was slightly ajar as it drove up, as if the occupants were about to jump out. McDowney became nervous and started to run away. When McDowney fled, appellant Bryant, armed with a .380 semi-automatic handgun, jumped out of the van and began to chase him, firing three shots as he ran. Hoping to end the pursuit, McDowney fell to the ground and feigned being shot. The ruse worked; Bryant ceased his pursuit and returned to the van.

While Bryant was chasing Tyrone McDowney, his cousin Stanley McDowney, who owned the white Volvo, was robbed by Wilson and Adams.[7] After taking Stanley McDowney's money, Adams and Wilson forced him out of his car at gunpoint and then drove away in it. Garrett waited for Bryant to return to the van and then drove with Bryant back to Clay Terrace, where they reunited with Adams and Wilson in the stolen Volvo. During this entire incident, Thea Williams remained in the back of the van.

After the men regrouped at Clay Terrace, they searched the Volvo and divided up the clothing and other goods found in the trunk.[8] They then discussed what to

do with Ms. Williams. Although they briefly considered making some money by allowing some of their friends to have sex with her, it was ultimately decided that Garrett would drop her off where they had originally picked her up. After Garrett drove off with Ms. Williams in the van, the three who remained behind—Adams, Bryant, and Wilson—set fire to the stolen Volvo to conceal their fingerprints. They then waited at Clay Terrace for Garrett to return, drinking and smoking marijuana.

While driving Ms. Williams back to the spot where she had been abducted, Garrett decided to rob some additional victims. He put a gun into one man's face and demanded crack cocaine, and later he stole a handbag from a woman who was walking along the sidewalk. A short time after the second incident, the police began canvassing the area because witnesses had called them to report a robbery suspect driving a burgundy and gray van. When Metropolitan Police Officer John Holloway heard the report over the radio and saw a van fitting the broadcast description, he turned on his flashing lights and began to follow it, intending to pull the van over. As soon as Garrett noticed the police car, however, he made a quick right turn and started to speed away. A police chase ensued that lasted for almost twenty minutes and involved several police vehicles at speeds of up to seventy miles per hour. The van also struck several other cars during the chase.

After apparently blowing one or more tires from driving recklessly, the van came

7. Another cousin, Todd McDowney, was in the car with Stanley when he was robbed, but Wilson in his testimony made no mention of what happened to him. Neither Stanley nor Todd was called as a witness.

8. Stanley McDowney owed a clothing store in Rappahannock, Virginia. According to Tyrone McDowney, his cousin Stanley had just

returned from New York, where he had bought a quantity of merchandise for his store. He routinely stopped in Washington en route back to Virginia to sell various items from his car because he knew a number of people in the area who would buy what he had for sale.

to a stop when it collided with several parked cars after trying to make a sharp turn to evade the police. Officer Holloway immediately got out of his car and approached the left front door of the van. As he drew closer, the glass from the door's window shattered all over him. A split-second later, Officer Holloway saw a gun pointed directly at his face through the driver's side window. Immediately he drew his service revolver and fired several rounds at the driver of the van, whom he later identified as Garrett. Shortly thereafter, more police officers arrived and also fired shots into the van.

Garrett was then removed from the driver's seat, and police officers searched the inside of the van for weapons. While searching, Officer Holloway discovered a partially dressed Thea Williams curled up behind the driver's seat.[9] As soon as she made eye contact with Officer Holloway, Ms. Williams exclaimed that she had been kidnapped and raped. Officer Holloway described her as "crying, shaking, [and] very distraught" as she told her story. Detective Cathy Sanderson, who placed her in an ambulance and questioned her, described her in similar terms ("very emotional, crying, very upset, very distraught"). Both Williams and Garrett were then taken to the hospital. Williams was never admitted, but Garrett was treated for gunshot wounds, from which he later recovered.

The van that was used by the four men was later dusted for fingerprints by Ruby Brown, an analyst with the Metropolitan Police; however, she was able to recover only the fingerprints of Adams and Wilson from the outside of the van. Other evidence seized from the van, including a .380 caliber semi-automatic pistol, condoms, condom wrappers, clothing from Stanley McDowney's car, and a checkbook and re-

ceipts bearing the name of Marvin Battle, was introduced at trial.

Appellant Adams testified that neither he nor Bryant was involved in any of the offenses charged. Adams acknowledged that he knew Wilson, but he insisted that they never had a "relationship" with each other. He explained the presence of his fingerprints on the van by testifying that he only touched it for a moment on the evening of September 19, but that he later left after being told that the van was stolen.

Appellant Bryant did not testify on his own behalf or present any other evidence.

## II. Opportunity to Cross-Examine

Both appellants contend that their convictions should be reversed because the trial court improperly curtailed the cross-examination of Samuel Wilson concerning his competency to testify and also restricted the questioning of a government psychiatrist who interviewed Wilson before trial. In addition, appellants challenge the court's refusal to permit cross-examination of Thea Williams concerning her activities as a prostitute after the events of September 19 and 20. Because the trial court did not go beyond permissible limits in restricting the cross-examination of these adverse witnesses, and because defense counsel had sufficient opportunity to engage in a meaningful cross-examination, appellants' argument fails. *See generally Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

A defendant's right to cross-examine the witnesses against him is protected by the Confrontation Clause of the Sixth Amendment. *See, e.g., Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Coles v. United*

---

9. Ms. Williams initially told the police that her name was Myza Lark.

*States,* 808 A.2d 485, 489 (D.C.2002). That right, however, is not unlimited. *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (the Confrontation Clause does not permit defendants to cross-examine witnesses "in whatever way, and to whatever extent, the defense might wish"); *Roundtree v. United States,* 581 A.2d 315, 323 (D.C.1990). Notwithstanding the Sixth Amendment, "the trial court has broad discretion to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant," *Grayton v. United States,* 745 A.2d 274, 281 (D.C.2000) (citations and internal quotation marks omitted), so long as the court's restrictions do not "keep[ ] from the jury relevant and important facts bearing on the trustworthiness of crucial testimony." *McCloud v. United States,* 781 A.2d 744, 752 (D.C. 2001). The court may also impose limits on cross-examination if the probative value of the questioning is substantially outweighed by the danger of unfair prejudice, or if the inquiry may divert the attention of the jury from the issue at hand. *See Grayton,* 745 A.2d at 281. In general, a trial judge has "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examination . . . ." *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431.

### A. The Cross–Examination of Samuel Wilson

■ Before trial, the prosecutor informed the court that he had been given a report the previous night concerning the competency of Samuel Wilson, one of the government's principal witnesses. Because the report indicated that Wilson had been hospitalized on occasion for mental illness, the court ordered that the report be disclosed to defense counsel as *Brady* [10] material and also ordered that Wilson be examined by a court psychiatrist, Dr. Roy Coleman. Dr. Coleman performed the court-ordered evaluation and testified out of the presence of the jury that, despite having a "severe personality disorder" and a "character disturbance," Wilson had no "clearly definable major mental illness" and was competent to testify.[11] Dr. Coleman acknowledged that Wilson had previously been diagnosed as a paranoid schizophrenic, as well as having conduct and adjustment disorders, but he stated that these mental problems would not affect Wilson's competency as a witness.

Dr. Coleman specifically disagreed with the August 1996 diagnosis of paranoid schizophrenia and stated that, during his two interviews with Wilson in April 1997, Wilson showed no signs of that illness. The doctor said that Wilson claimed to have a clear memory of the events on the night in question and gave no indication that he had ever suffered from any hallucinations. Further, Dr. Coleman believed that Wilson was not afflicted with any mental problems that would have affected his ability to perceive in September 1995. He described Wilson's condition as "a distortion of the evolution of his personality structure, so that he tends to be impulsive, to be easily frustrated . . . [to] have a sense of entitlement, an inability to control his behavior when frustrated, an inability to delay gratification." In the end, Dr. Coleman concluded:

---

**10.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**11.** The trial judge also noted that she had seen Wilson testify at the prior trial of Garrett and Bryant.

I thought that he was capable of observing. He could remember that he had seen me previously.... His judgment was adequate .... [H]e understood ... that he had made a plea bargain ... [and] from a superficial point of view, he had a clear grasp and clear understanding of the events ... [and] the context within which he was testifying.

As a possible reason for the misdiagnosis of schizophrenia, Dr. Coleman suggested that if Wilson had been on drugs at the time, they could have been the source of his irregular behavior. He did acknowledge, however, that if Wilson was in the midst of a schizophrenic episode, his perception of events during that time would have been affected.

After hearing from Dr. Coleman, the court announced that it would permit Wilson to be cross-examined regarding his mental state on the date of the offenses and during any other time about which he might testify. All questions relating to his mental state outside of those dates, however, were barred. In so ruling, the court declared that the mere fact that Wilson was a witness did not "make it open season on his entire mental history." Appellants now contend that because their ability to question Wilson was thus limited, the trial court violated their Sixth Amendment right of confrontation.[12]

Appellants rely chiefly on *Brown v. United States*, 766 A.2d 530 (D.C.2001),

and *Vereen v. United States*, 587 A.2d 456 (D.C.1991), for the proposition that a trial court commits reversible error when it restricts cross-examination about the credibility of a witness, either by questioning the witness directly or by interrogating an expert. *See Brown*, 766 A.2d at 539; *Vereen*, 587 A.2d at 457–458. These cases, however, depend on their particular facts and do not support appellants' argument.[13]

In *Brown* the trial court restricted the direct examination of a psychiatrist about the mental condition of the complaining witness. This court reversed the conviction, holding that the defense was "entitled to elicit from [the doctor] his expert opinion" about both the nature of the witness' illness and the effects of her failure to take prescribed medication. 766 A.2d at 539–540. Similarly in *Vereen*, defense counsel was not allowed "to present psychiatric testimony to negate the credibility of [a] rebuttal witness." 587 A.2d at 456. The witness was allowed to testify, even though she had a history of mental disorders, had recently undergone a psychiatric examination, and on the day of trial "was experiencing unusual symptoms." However, because the court refused to hear expert testimony that might "bear on her perception, recollection, or ability to distinguish fact from unreality"—in other words, testimony that went directly to her competency to testify—we held that the trial court "erred in submitting the witness to the jury ... without the benefit of hearing

---

**12.** Counsel for Bryant also sought to have Dr. Coleman testify before the jury about the elements of a "character disturbance." The court ruled that this went beyond the issue of competency and denied the request.

**13.** Appellants also seem to confuse competency with credibility by claiming that, because Wilson's credibility was suspect, his competency was suspect as well. Competency and credibility, however, are two separate issues. A competency finding is always made by the

court. *See Vereen*, 587 A.2d at 457; *Hilton v. United States*, 435 A.2d 383, 387 (D.C.1981). Credibility, on the other hand, is determined by the trier of fact, which in this case was the jury, and this court must defer to its credibility findings if they are supported by the evidence. *See Sothern v. United States*, 756 A.2d 934, 941 (D.C.2000). Therefore, even though appellants may believe that Wilson was not a credible witness, it does not follow that he was incompetent to testify in the first place.

expert opinion as an aid in deciding competency." *Id.* at 458. In this case, by contrast, appellants were not restricted in inquiring about Wilson's present mental condition; rather, they were precluded only from cross-examining him about a mental illness that he might have suffered sometime before the events about which he was called to testify. *See Robinson v. United States,* 642 A.2d 1306, 1309–1311 (D.C.1994) (upholding trial court's refusal to allow cross-examination of complaining witness in assault case about her alcohol problems six years before the date of the offense, and noting that "the only alcohol-related issue before the jury [was] whether she was intoxicated and abusive on [that date], as claimed by [the defense]"). In restricting defense counsel's cross-examination, the trial court in the instant case was not, as appellants claim, preventing the jurors from being informed on all matters affecting credibility, but simply preventing them from considering evidence of limited probative value that was, at best, marginally relevant. *See Grayton,* 745 A.2d at 280–281.

Wilson was cross-examined extensively about his statements that he never raped Thea Williams or lied to investigators.[14] Additionally, he was questioned about whether he had taken drugs or alcohol on the night of September 19–20, and what effect they might have had on his memory. He was also cross-examined about whether he experienced any hallucinations on that night. His answers to these inquiries certainly permitted the jurors to assess his credibility and decide whether he had problems with memory or perception on the night in question.[15]

This court was presented with a similar scenario in *Velasquez v. United States,* 801 A.2d 72 (D.C.2002), and rejected an argument essentially the same as that made by appellants here. In *Velasquez* we held that the trial court did not err when it prevented defense counsel from exploring the victim's mental breakdown that occurred three years after an attempted rape because it was not "relevant to [the victim's] perception of events at the time of the assault." *Id.* at 79. We went on to say that an inquiry into the victim's subsequent illness would only "introduce into the case a collateral issue which would confuse the jury . . . ." *Id.* In the present case, as in *Velasquez,* appellants sought to introduce evidence of Wilson's mental condition that was not relevant to Wilson's perception of events on the night in question, but at another time in his life unrelated to his testimony; accordingly, it was not permitted.

On this record, we are satisfied that the defense had a "meaningful" opportunity to confront adverse witnesses. *See Flores v. United States,* 698 A.2d 474, 479 (D.C. 1997). We find no error.

### B. *The Cross–Examination of Thea Williams*

▮ Appellants also claim that they were impermissibly prevented from cross-examining Ms. Williams about her activities as a prostitute after the night of September 19–20, 1995. This argument is without merit.

---

14. Wilson also acknowledged on cross-examination that he was testifying pursuant to a plea agreement with the government which reduced his potential exposure to prison from twenty-five to eight years. In addition, he admitted lying to the police, prosecutors, and the grand jury in the course of the investigation in this case.

15. Even though no cross-examination concerning the topic was permitted, Wilson himself acknowledged that he "was going through a mental disorder" when asked to explain why he was eating light bulbs in 1990.

In Bryant's first trial, defense counsel sought to introduce evidence of Ms. Williams' prostitution-related activities after the events of September 19 and 20.[16] Counsel sought to show that because Williams continued to work as a prostitute after the incident, she might have consented to the sexual activity in the van on the night in question.[17] Counsel also maintained that such testimony would help the jury evaluate Ms. Williams' credibility and was "constitutionally required."[18] After considering these arguments, the court held that such evidence was of "extraordinarily marginal relevance" and that "balancing the probative nature of this [evidence] against its prejudice makes absolutely clear that the prejudice outweighs it." The court therefore refused to allow the requested cross-examination.[19]

In considering whether evidence such as this was properly excluded, this court is highly deferential to the trial court's decision and will not overturn it except on a showing that the trial court gravely abused its discretion. *See, e.g., Umanzor v. United States*, 803 A.2d 983, 1000 (D.C.2002). We find no such abuse on the record before us.

In a sex offense case, evidence of a victim's sexual history with someone other than the defendant is generally inadmissible. *See* D.C.Code §§ 22–3021, 22–3022 (2001) (limiting evidence of past sexual conduct to reputation and opinion evidence in most cases); *see also McLean v. United States*, 377 A.2d 74, 78 (D.C.1977) (rape victims cannot be questioned about other sexual activity). These protections exist even if the victim is a prostitute. *Hagins v. United States*, 639 A.2d 612, 615–616 (D.C.1994); *Brewer v. United States, supra* note 6, 559 A.2d at 320. To admit evidence of sexual activity after the date of the offenses in this case would tend only to suggest that because Ms. Williams continued to have sex at some point after being raped, she therefore consented on the night in question. That is exactly the type of speculation that the law seeks to prevent. *See, e.g., Hagins*, 639 A.2d at 615; *McLean*, 377 A.2d at 78–79.

Our decision in *Street v. United States*, 602 A.2d 141 (D.C.1992), on which appel-

---

**16.** When Bryant was retried with Adams, the court's rulings concerning the cross-examination of Ms. Williams from the previous trial were accepted as the law of the case.

**17.** Significantly, Adams never asserted that Ms. Williams consented to the sexual activities in the van. His defense was based entirely on his denial that he participated in any of the crimes charged.

**18.** This language comes from what is commonly known as the District of Columbia's "rape shield" law. That statute provides, in pertinent part:

> Notwithstanding any other provision of law, in a criminal case in which a person is accused of [a sex offense], evidence of a victim's past sexual behavior other than reputation or opinion evidence is ... not admissible, unless such evidence ... is constitutionally required to be admitted[.]

D.C.Code § 22–3022(a)(1)(2001), formerly codified as D.C.Code § 22–4122(a)(1) (1996).

**19.** The government had indicated before trial that it might call an expert to testify about the general "rules" of prostitution, *i.e.*, that a prostitute would not have sex with multiple partners or "date" someone who was armed. Upon learning of this potential witness, defense counsel sought permission to cross-examine Ms. Williams to learn whether she had done either of these acts before or after the night in question. If she had, counsel asserted, such evidence could be regarded as relevant to the issue of consent. The court agreed that if the government called an expert to testify about the "rules" of prostitution, such cross-examination of Ms. Williams would be permitted. At trial, however, the government never called such a witness.

lants rely, does not support their argument that evidence of post-rape activity is probative of consent. In *Street* this court upheld the admission of testimony about changes in a victim's post-rape behavior [20] to show a *lack* of consent. *Id.* at 144. It does not logically follow, however, that evidence of a rape victim's sexual activity after the incident shows that she consented to the alleged rape. Such a holding would turn *Street* on its head.

Appellants also cite *Henson v. State*, 535 N.E.2d 1189 (Ind.1989), to support their argument that because Ms. Williams continued to work as a prostitute after September 20, her behavior made it less probable that a rape occurred. Aside from the fact that *Henson* is not binding on this court, the evidence in that case showed that the victim's conduct on the day after an alleged rape was not consistent with the expected behavior of someone who had suffered such a traumatic event.[21] In this case, the evidence that appellants sought to present would have showed only that Ms. Williams did not give up her work as a prostitute after the night in question. Moreover, unlike the evidence in *Henson*, which showed non-sexual behavior, Ms. Williams' post-rape activities as a prostitute were plainly sexual. Proof of such activities was therefore barred by the rape shield law, as well as the *McLean* line of cases. We hold accordingly that evidence of her decision to continue working as a prostitute was not "constitutionally re-

quired" to be admitted, as appellants maintain. *See, e.g., Fensterer,* 474 U.S. at 20, 106 S.Ct. 292.

III. THE LACK OF A JURY INSTRUCTION
ON CONSENT

 Appellants argue that the trial court erred in refusing to give a jury instruction on consent as a defense to the kidnapping and rape charges. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 5.18 (4th ed. 1993). In general, "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). The trial court, however, is not required to give a requested instruction if there is no evidentiary basis for it. *Guillard v. United States,* 596 A.2d 60, 62 (D.C.1991). "In determining whether a defense instruction was properly denied, we review the evidence in the light most favorable to the defendant." *Adams v. United States,* 558 A.2d 348, 349 (D.C.1989). In this case, because there was no evidence whatsoever that Ms. Williams consented to being kidnapped and raped, we hold that the trial court's refusal to give the requested instruction was not error.

Appellants base their claim of error on the fact that Ms. Williams acknowledged

---

**20.** The victim's family members were allowed to testify that the victim "had not had a boyfriend since the incident ... that she was jumpy, fearful of men on the street ... [that she] looked 'solemn' when the topic of sexual assaults was discussed in her presence ... [and that she] was afraid to walk unescorted" to and from the bus stop. *Street*, 602 A.2d at 143.

**21.** In *Henson* the victim testified that she was raped by a man she briefly met at a bar, who then approached her after closing and forced

her to have intercourse with him at knifepoint. The next evening, the victim returned to the same bar and drank and danced for two hours. At trial, defense counsel was prohibited from asking an expert whether such conduct was typical of those suffering from a traumatic rape. The Indiana Supreme Court reversed, holding that such testimony was relevant because it tended to show that a rape might not have occurred. 535 N.E.2d at 1194.

being a prostitute, and on Mr. Wilson's testimony that he thought, because of her status as a prostitute, that there was nothing wrong with what appellants did to her. We strongly disagree. Ms. Williams was taken from the street at gunpoint, forced into a van, and held for over six hours, during which she was ordered to perform sexual acts with several men or else she would be shot. Even Mr. Wilson testified that she was "forced to have intercourse." Furthermore, Ms. Williams said she did not try to escape from the van because she was "scared" of what her captors would do to her if she did. This evidence in no way raises the possibility that Williams did anything to make the assailants believe she had consented to their actions, or that she in fact consented. While Ms. Williams did drive the van while Garrett robbed two people, she drove it only under compulsion, because she was ordered to do so. In addition, while her profession might raise questions about her moral beliefs, it does not follow that she would consent to having sex with several unknown men after being kidnapped at gunpoint. *See generally Brewer*, 559 A.2d at 320–321.

Finally, Wilson's testimony that he did not intervene because he did not think anything was wrong with what his companions were doing was not sufficient to warrant a consent instruction. His personal opinion regarding the appropriateness of a series of sexual assaults on a prostitute has no probative value on the issue of *her* consent. Thus, because no evidence warranted a consent instruction, the trial court did not commit error by failing to give one.

## IV. EXCITED UTTERANCES

■ Appellant Adams challenges the admissibility of Williams' statements to Officer Holloway and Detective Sanderson, after she was discovered in the back of the van following the shootout with police, that she had been "kidnapped" and "raped" by appellants. Because the statements qualified as excited utterances, admissible under an established exception to the hearsay rule, we hold that the trial court did not abuse its discretion in admitting them.

■ The admissibility of an excited utterance "is committed to the sound discretion of the trial court. We will reverse on appeal only if a ruling is clearly erroneous." *Reyes–Contreras v. United States*, 719 A.2d 503, 505–506 (D.C.1998) (citations and internal quotation marks omitted). An excited utterance has three elements:

(1) the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances, which in their totality suggest spontaneity and sincerity of the remark.

*Lyons v. United States*, 683 A.2d 1080, 1083 (D.C.1996) (quoting *Nicholson v. United States*, 368 A.2d 561, 564 (D.C. 1977)).

Each of these elements is present in this case. First, Ms. Williams made the statements in the moments immediately following a six-hour kidnapping that involved repeated rapes and ended in a dramatic police shootout. Being inside a van that becomes the target of police gunfire certainly qualifies as a serious occurrence. The second element is established by the fact that Ms. Williams made her comments as soon as she saw Officer Holloway, thereby eliminating any opportunity to reflect. Moreover, when Officer Holloway saw her in the back of the van, she was crying, shaking, and very distraught. Finally, we are satisfied that the surrounding circumstances "in their totality" are suffi-

cient to "suggest"—indeed, to show rather persuasively—that the comments made by Ms. Williams to the police met the third requirement of the *Lyons–Nicholson* test. *See Lyons,* 683 A.2d at 1083.

■ The fact that the utterance is not descriptive of the exciting event is only one of the factors which a trial court may take into account when considering whether the statement is truly spontaneous. While Ms. Williams' report that she was kidnapped and raped was arguably not related to the startling event of the police shootout, seeing Officer Holloway was her first opportunity to comment about her experiences. Consequently, her statement to the officer about events that happened before the shootout is not necessarily barred; "reliability of the utterance is not inflexibly dependent upon the subject matter of the utterance." *Murphy Auto Parts Co. v. Ball,* 101 U.S.App. D.C. 416, 419, 249 F.2d 508, 511 (1957).

■ Ms. Williams also made similar statements about having been kidnapped and raped to Detective Sanderson a few moments later, after she was taken from the van and placed in an ambulance. Appellant Adams claims that these comments should also have been held inadmissible because of the lapse of time between the startling event and the making of the comments. This court has consistently held, however, that a lapse of time, while a relevant factor, is not dispositive on the question of admissibility. *See Price v. United States,* 545 A.2d 1219, 1226 (D.C. 1988) ("a lapse of time is relevant, but not controlling"); *Alston v. United States,* 462 A.2d 1122, 1127 (D.C.1983) ("statements made one hour after the alleged offense have been allowed"); *Young v. United States,* 391 A.2d 248, 250 (D.C.1978) (statements made near the crime scene almost an hour after the event were spontaneous utterances because they were "not made

under the impetus of reflection"); *Bandoni v. United States,* 171 A.2d 748, 750 (D.C.1961) ("time alone is not controlling in determining the spontaneity of an exclamation"). Furthermore, the statements to Officer Holloway and Detective Sanderson were consistent with each other and were corroborated by other evidence admitted at trial. Ms. Williams was also available for cross-examination concerning all of her statements to both officers, so that any problems or deficiencies in those statements could have been exposed to the jury by able defense counsel.

For all of these reasons, we are satisfied that the statements made by Ms. Williams to both police officers were not the product of reflective thought but rather a spontaneous reaction to the startling event of the police shootout. It follows that the trial court committed no error by admitting these statements over appellants' objection.

### V. MERGER

■ Lastly, appellants argue that several of their convictions merge and should therefore be vacated. We consider such merger issues *de novo. See Maddox v. United States,* 745 A.2d 284, 294 (D.C. 2000). Because appellants' two armed robbery convictions and the related convictions of possession of a firearm during a crime of violence ("PFCV") merge, one armed robbery conviction and one PFCV conviction must be vacated as to each appellant. To that limited extent, the case must be remanded for resentencing. None of appellants' remaining convictions warrant similar treatment.

■ Under the Double Jeopardy Clause of the Fifth Amendment, a convicted defendant cannot receive multiple punishments for the same offense. *See, e.g., North Carolina v. Pearce,* 395 U.S. 711,

717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *Black v. United States*, 755 A.2d 1005, 1009 (D.C.2000). The Double Jeopardy Clause, however, "does not prohibit separate and cumulative punishment for separate criminal acts." *Owens v. United States*, 497 A.2d 1086, 1094–1095 (D.C. 1985), *cert. denied*, 474 U.S. 1085, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986). Therefore, when there is "an appreciable period of time" between the acts on which two criminal convictions are based, there is no merger, even if the interval is "quite brief." *Gardner v. United States*, 698 A.2d 990, 1002 (D.C.1997). If the same act or transaction violates two separate statutes, "the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *see also Byrd v. United States*, 598 A.2d 386, 389 (D.C.1991) (en banc). The *Blockburger* rule has been codified in this jurisdiction in D.C.Code § 23–112 (2001). *See Whalen v. United States*, 445 U.S. 684, 691–692, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); *Byrd*, 598 A.2d at 389.

■ As the government concedes, each appellant's two convictions of armed robbery merge into one, and therefore one should be vacated. Because the evidence showed that a single item, Stanley McDowney's car, was stolen and that clothes were later taken from the trunk of that car, a second conviction of armed robbery was not warranted; the robbery of both the car and the items it contained was a single criminal act. *See Morris v. United States*, 622 A.2d 1116, 1129 (D.C. 1993). Each appellant was also convicted of two counts of PFCV, based on two charges of armed robbery. Since we agree that there was only one robbery, one

of those two PFCV convictions must also be vacated.

■ Appellants contend that their two rape convictions and corresponding PFCV convictions also merge because their acts of rape constituted a continuing episode of sexual activity. We rejected essentially the same argument in *Brown v. United States*, 795 A.2d 56, 64 (D.C.2002), and we reject it again here. Brown and his co-defendants, although they repeatedly raped their victim, took distinct breaks between the individual episodes of rape. In like manner, appellants and their companions took turns sexually assaulting and raping Ms. Williams over an extended period of time that involved changes in location and stops to purchase more condoms. Each assaultive incident was therefore a separate criminal act, and their convictions do not merge. *See Gardner*, 698 A.2d at 1003; *Spain v. United States*, 665 A.2d 658, 660–661 (D.C.1995).

■ Appellants further maintain that their kidnapping and sexual abuse offenses merge because detention is an integral part of every rape. Regardless of whether this assertion is or is not true, detention is not an element of sexual abuse, and each offense has at least one element that the other does not have, thereby precluding merger. *See Blockburger*, 284 U.S. at 304, 52 S.Ct. 180; *Byrd*, 598 A.2d at 389. Insofar as appellants' argument is based on the reasoning in *Robinson v. United States*, 388 A.2d 1210, 1211 (D.C.1978), we cannot accept it. We held in *Parker v. United States*, 692 A.2d 913, 916 (D.C.1997), that the "fact-based" merger analysis of *Robinson* "has been superseded" by our en banc opinion in *Byrd*. *Accord, Malloy v. United States*, 797 A.2d 687, 691 (D.C.2002) (citing *Parker* and *Byrd*). On this issue *Robinson* is no longer a viable precedent.

Nor do the convictions of armed carjacking and armed robbery merge. This court

squarely held in *Pixley v. United States,* 692 A.2d 438, 440 (D.C.1997), that armed carjacking and armed robbery do not merge because "each of the two crimes requires proof of a factual element which the other does not . . . ." *Pixley* is controlling on this point. *See also Blockburger,* 284 U.S. at 304, 52 S.Ct. 180.

■ Finally, appellants contend that because their crime spree extended over several hours, their actions should be considered one prolonged crime, not a series of independent offenses. We reject this argument as well. Despite the length of the crime spree, many of their crimes occurred after significant breaks in time, changes of location, and opportunities to reformulate criminal intent. Over a period of several hours, they came to several "forks in the road," *see Spain,* 665 A.2d at 660–661, and as a result, their crimes were separate and distinct, even when they involved the same or similar actions with the same victim. *See Gardner,* 698 A.2d at 1002–1003. Thus none of appellants' remaining convictions merge.

## VI. CONCLUSION

Appellants' convictions are affirmed on the merits. Because certain convictions merge, we remand this case to the trial court with directions to vacate one armed robbery conviction and one PFCV conviction for each appellant, and to resentence accordingly. Such a remand will enable the trial court "to effectuate its . . . sentencing plan without violating the Double Jeopardy Clause." *Garris v. United States,* 491 A.2d 511, 514 (D.C.1985).

*Affirmed on the merits, remanded for resentencing.*